Robert L. Sweet ..................(SEAL)
Shirley A. Sweet ..................(SEAL)
..............................................(SEAL)
5 0422657 ...........(SEAL)

Ken FOLLETT, Plaintiff,
v.

The NEW AMERICAN LIBRARY, INC.,
and William Morrow and Company,
Inc., Plaintiffs–Intervenors,
v.

ARBOR HOUSE PUBLISHING COMPA-
NY, a division of The Hearst
Corporation, Defendant.

ARBOR HOUSE PUBLISHING COMPA-
NY, a division of The Hearst Corpora-
tion, and Scott Meredith Literary Agen-
cy, Inc., on its own behalf and as agent
for Star Agency Establishment, Plain-
tiffs,

v.

Ken FOLLETT, Albert Zuckerman, and
Sue Rapp, Defendants.

Nos. 80 Civ. 3087, 80 Civ. 3477 (RWS).

United States District Court,
S. D. New York.

Aug. 20, 1980.

Moses & Singer, New York City, for Ken Follett, Albert Zuckerman and Sue Rapp by David B. Eizenman, Arthur F. Abelman, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for New American Library and William Morrow and Co. by Robert G. Sugarman, Yvecte Miller, Jerome C. Pontillo, New York City, of counsel.

Rembar & Curtis, New York City, for Arbor House Pub. Co. and Scott Meredith Literary Agency, Inc. by Charles Rembar, Frank R. Curtis, Mark Budwig, New York City, of counsel.

SWEET, District Judge.

This action was commenced by the plaintiff, Ken Follett ("Follett"), an author and British subject now residing in France. Shortly thereafter his publishers, William Morrow & Company, Inc. ("Morrow") and the New American Library, Inc. ("New American"), both New York corporations, intervened as plaintiffs. The defendant is Arbor House Publishing Co., Inc. ("Arbor House"), a division of the Hearst Corporation, a Delaware corporation with offices in New York. The initial action in this court was consolidated for all purposes with a removed state court action in which Arbor House and Scott Meredith Agency, Inc. ("Meredith"), a literary agency and a New York corporation, were the plaintiffs and Albert Zuckerman and Sue Rapp, both New York residents and literary agents, and Follett were defendants. A motion for a temporary restraining order was made by the plaintiffs and was granted in part, and cross–motions for preliminary injunctions were made by both plaintiffs and defendant. Testimony was taken on June 3, 4, 5, 6, 9, 16, 18, 25 and 26, 1980. The hearing on the cross–motions was consolidated with the trial in accordance with Fed.R.Civ.Proc. 65.

This action presents questions arising out of the intended publication by Arbor House this fall of a book, *The Gentlemen of 16 July*, which Arbor House intends to attribute to Follett as principal author, "with Rene Louis Maurice," a pseudonym for three French authors. Follett has written *Key to Rebecca*, which will also be published by New American this fall, and seeks to restrain Arbor House from publishing *The Gentlemen of 16 July* and from using the currently proposed authorship attribution. Arbor House seeks to restrain Follett, Morrow, and New American from disparaging *The Gentlemen of 16 July* and its authorship attribution. The principal statute involved is section 43 of the Lanham Act, 15 U.S.C. § 1125, and in varying degrees counsel agree that there is no directly relevant precedent.

The issue for decision is both unique and fascinating, requiring the court to consider the practices in the publishing industry with respect to authorship attributions, the meteoric rise of Follett as a novelist, the distinction between creating and editing a literary work, and ultimately, the effect of all of this on the public. Based upon the evidence that has been presented by highly skilled counsel, at least one of whom has authored as well as litigated, an injunction must issue requiring Arbor House to indicate that *The Gentlemen of 16 July* is a work of nonfiction written by Rene Louis Maurice with Ken Follett, with attribution to be equal and in chronological order—that is, with Rene Louis Maurice first. The following constitutes the court's findings of fact and conclusions of law.

Despite the difficulty in reaching the ultimate conclusions relating to creativity and publishing integrity, the facts revealed by the testimony and the exhibits are largely undisputed.

On July 16, 1976, Albert Spaggiari and his confederates began tunnelling under the streets of Nice, France. By July 19, 1976, they had reached their goal, a bank vault, and had removed some 60 million francs of property in various forms. Subsequently, certain of the confederates were apprehended, as was Spaggiari. On March 10, 1977, by a dramatic leap from a courthouse window, Spaggiari escaped. These events were, of course, chronicled in the press at the time.

Shortly after the theft, three French journalists collaborated on a book-length account of these events. This account was published in France as "Cinq Milliards au Bout de l'Egout" under the attribution Rene Louis Maurice, the pseudonym of the three reporters. Jean Claude Simoen certified in May 1977 that he was the author of this work. Be that as it may, Clemens von Bezard, the director and principal owner of the Star Agency Establishment ("Star"), a Liechtenstein company engaged in publishing, acquiring and licensing literary rights, entered into negotiations with Simoen. As a consequence of those negotiations, Bezard testified that he acquired the right to publish the account outside France. Bezard translated the account into German and had it translated into English by Jeffrey Robinson.

In the summer of 1977, Bezard communicated with his agent in England, Burnett Rigg, to arrange for publication of the account by a British publisher. As a consequence of Rigg's efforts, William Collins Sons & Company Ltd. ("Collins") purchased the account for publication by Fontana Paperbacks, a division of Collins.

At the same time, Follett became involved, also through Rigg who acted as his agent. Follett had started his literary career by working as a reporter. By 1977 he had written ten books, including one children's novel and two thrillers, seven of which had been published under a by–line other than Ken Follett. To further his knowledge of his profession, he had sought and obtained employment as an editor and had progressed to a position as deputy managing director of a publishing house.

Rigg suggested to Collins and Star that Follett be given the translation to review and, according to the final agreement between Star and Collins, to edit the work and prepare it for publication. On July 12, Follett wrote to Rigg suggesting that considerable work was required, including restructuring the story, bringing style to the writing, exploiting the drama, developing the characters and filling in gaps. On August 5, 1977, Simon King, on behalf of Collins, agreed to pay Follett 850 pounds "for refashioning the typescript" as Follett had suggested, on condition that Follett visit Nice to obtain background material. Thereafter Follett went to work to revise the manuscript which was subsequently published under the title *The Heist of the Century*.

Follett is an efficient, careful and diligent ex–reporter and editor. Fortunately for this writer, his work is carefully detailed and explicit. First, he prepared his "schema" for rewrite, a six–page document posing certain questions to which Follett sought answers. He sent this to Bezard,

and it was followed up by a trip to Nice in September, 1977.

In Nice, Follett was met by Bezard. They visited certain of the locations referred to in the account and were joined by Carolyn Atkinson, then a part–time employee of Bezard. The next day, Saturday, was spent without progress on the assignment, but on Sunday, Bezard, Follett and Atkinson met with Rene Cenni, one of the journalists who had written the French account. Atkinson translated and Follett meticulously recorded Cenni's answers to the questions posed in the "schema." During this working luncheon, Follett requested by–line credit from Bezard, a request casually and quickly granted in order not to raise the issue in Cenni's presence.

On his return Follett worked daily for twelve days using the Robinson translation, a second translation of the French account, newspaper clippings, his own notes and the "schema." The work when completed contained between 42,000 and 43,000 words on 160 printed pages. It was submitted to Rigg on September 26, 1977. King's response in late November characterized the work as a "rewrite," "splendid," and "terrific."

Notwithstanding this reaction, the question of copyright and attribution was not so satisfactorily resolved. King refused Follett's requested copyright, citing Rigg, but agreed to credit Follett on the title page. Follett insisted on a copyright for his "rewrite," claimed a further financial interest in the book, and implied that legal action would be taken to enforce his position. Letters were exchanged and then on May 22, 1978, David Grossman, Follett's London agent, assured King that no copyright claim would be made by Follett, and that the attribution of "Rene Louis Maurice with Ken Follett" on the title page would be satisfactory to Follett.

*The Heist of the Century* was published in England in the fashion just described, namely "Rene Louis Maurice with Ken Follett" on the title page, and the pseudonym alone on the cover. It was thereafter offered to at least seven publishing houses in the United States by Zuckerman in May 1978. No publication ensued, and New American declined the book again in the fall of 1979.

Also in the fall of 1977, Follett contracted for the publication in the United States of his book *Storm Island*, which had already come out in England. It was retitled *Eye of the Needle*, and Arbor House, the publisher, embarked upon a campaign to promote the book. The book was a great success, achieving best seller status, and possessed what Donald Fine, the president and chief executive officer of Arbor House, described as "narrative drive." It was in the view of this reviewer an exciting spy story, laid in England during World War II with a challenging plot animated, as Follett explained, not only by external events but also by the characters of the protagonists. This was particularly so with respect to its dramatic denouement.

Arbor House obtained an option for Follett's next book, ultimately titled *Triple*, a tale involving espionage relating to the establishment of nuclear capacity by Israel. Follett had also conceived of a plot relating to Marshal Rommel's desert campaign and the espionage and counterespionage which was involved. Fine liked the World War II plot better than *Triple* and urged Follett to let Arbor House publish it. However, Follett decided to proceed with *Triple* partly, according to Fine, to avoid being typed as an author writing only about the World War II period. *Triple* was submitted to Arbor House in outline form late in 1978, and the manuscript was delivered early in 1979. A dispute over editing ensued, Follett threatened litigation to bar certain changes in the manuscript, the matter was resolved, and *Triple* was published successfully, completing Follett's obligation to Arbor House.

Follett then contracted with New American for future works and received an advance against royalties of $3,000,000 for his next three books. He delivered the first of these, *Key to Rebecca*, the desert campaign book, early this year and its publication this fall was announced to the trade in the

spring. *Key to Rebecca* will be a volume of 384 pages to be sold for $12.95.

In May, 1980, Star, still claiming possession of the rights to *The Heist of the Century*, retained Meredith to represent its interests in the United States. On May 13, Star sent Fine the book to review for publication. Shortly after reading it, Fine determined to publish the book as *The Gentlemen of 16 July* and entered into a contract with Star which provided for a $25,000 advance royalty payment. Fine knew of New American's plans for the publication of *Key to Rebecca* in the fall.

Arbor House has prepared a jacket for *The Gentlemen of 16 July* that has the following authorship attribution:

"by the author of TRIPLE and EYE OF THE NEEDLE
KEN FOLLETT
with Rene Louis Maurice"

Only Follett's name is listed on the spine portion of the jacket. *The Gentlemen of 16 July* is expected to constitute 208 printed pages and to sell for $9.95.[1]

No cases have been brought to the attention of the court relating to the question of attribution, and the testimony established contrasting practices in the publishing industry. Different attributions which frequently are used include "as told to," "by," "with," and co-authorship. One witness testified that there is no difference between "by" and "with" with respect to attribution. There are instances of publication of books under the name of one author actually written by another, without attribution, or written entirely by one author with principal attribution to another. These attributions are arrived at by negotiations with the authors and at the direction of the publisher. There was testimony that if the publisher possesses all the rights, the attribution is at his discretion.

Both Arbor House and Morrow plan to promote their respective Follett books vigorously, have announced their intentions to the trade, and have invested substantial sums in the promotion and publication of their respective books. Both books are scheduled for release this fall. All parties agree that the critical and public success of each book will substantially affect sales of the other. No testimony concerning public opinion was presented, and it is difficult, if not impossible, to conceive how such evidence could be obtained as events now stand.

Much of the evidence, naturally, centered on an analysis of Follett's work which resulted in the *The Heist of the Century*, retitled for United States publication as *The Gentlemen of 16 July*, including a line–by–line comparison of Follett's product and its principal predecessor, the Robinson version. What is without challenge is that Follett added to the previous versions a prologue, an epilogue, chapter headings, about half a page of analysis of Spaggiari's psychology obtained conveniently from a next door neighbor of Follett's who was a psychologist, and details obtained from Cenni. It is also conceded that Follett eliminated the frequent use of flashback in favor of a chronological march of events, and made alterations to Anglicize the references. In addition, the work was rewritten, and characterizations were sharpened. A typical example of Follett's work in this regard can be seen in these respective treatments of Michele Seaglie, a prostitute and minor character:

> One of these people was a young woman named Michele Seaglie, known as Sandra. She was a prostitute in Toulon until she upgraded herself to the status of call girl, working elegant parties, going out with elegant men who could afford to pay the higher prices for the company of a beautiful girl. (Robinson translation, p. 81)
>
> She was beautiful, elegant and discreet. Her phone number was passed from one man to another between the cheese and the fruit at business lunches. (*The Heist of the Century*. p. 114).

---

1. After the proof had been taken, counsel for Arbor House submitted a revised intended attribution "by Ken Follett and Rene Louis Maurice" with all names printed in the same size. This prescient concession comes quite close to the requirements of this opinion.

While there are a number of instances of rewriting of this kind, which enhance the personalities of the characters for the reader, the characterizations themselves remain essentially the same as depicted by the French authors. The incidents reported are unchanged though the sequence is altered so that each follows chronologically. There can be no doubt that to the reader of the English language, *The Heist of the Century* is a more compelling version of the historical events surrounding the Nice bank robbery than the Robinson translation. Similarly, a reading of *The Heist of the Century, Triple* and *Eye of the Needle* establishes that the latter two Follett novels are on a much higher literary level than *The Heist of the Century.* These are fictional pieces, driven by engines of character and plot far more complete and intense than the few hints contained in *Heist.* However, the form of the narrative and use of prologues and epilogues is similar in all three works. One gains little insight into Spaggiari's motivations and receives only a glimpse of his relationship with his wife, but the reader knows Dickstein and Faber, the protagonists of *Triple* and *Eye of the Needle*, intimately. While established facts concerning the Nice robbery constrain the drama, depth and scope of *The Heist of the Century*, Follett's craftsmanship and capacity to define his characters are unchecked in his fictional works. The very intricacy of plot and character, which provides the "narrative drive" so admired by Fine and according to Follett so difficult to achieve in *Eye of the Needle*, and *Triple* stands in striking contrast with the comparatively flat, historical narrative tone of *The Heist of the Century.*

Although hired to edit according to the Star/Collins agreement, Follett did more. Fine, a concerned and capable editor who is justly proud of his ability to discern works of quality and even to improve them, drew the line between editing and authorship on a practical level. He noted that authors do not permit editors to obtain authorship credit, as a practical matter, even if the revisions are substantial. Here, Follett in fact rewrote the work. The language and presentation of the work were substantially improved and altered. Follett sought and obtained some authorship credit, though less than he felt he had earned at the time. Certainly the line between author and editor is unique in each instance. It turns in this instance on an analysis of sheer output and rewriting, rather than upon creativity and concept. Yet, this factual determination that Follett is an author does not end the inquiry as Arbor House would suggest, for the question of the propriety of the attribution of authorship in *The Gentlemen of 16 July* remains.

Although the parties have attempted to frame the issues in this case in different, and in some respects contradictory fashion, the controlling question is whether the attribution to Ken Follett as the principal author of *The Gentlemen of 16 July* constitutes a false representation and false designation of origin. Preliminarily, it is useful to consider the approaches advanced by the parties even though certain of these have been rejected.

Follett, Morrow and New American contend that an agreement was reached among Follett, Collins and Star restricting the use of Follett's name in connection with *The Heist of the Century.* They claim that Collins, Star and Follett agreed that Follett's name would not be used on the cover of the book and that the attribution on the title page would be limited to "Rene Louis Maurice with Ken Follett." Plaintiffs urge that Star and Arbor House are bound by these restrictions. *See Bernham v. Bernham-Stein Furs, Inc.*, 123 N.Y.S.2d 872 (N.Y.Co. Sup.Ct.1953).

However, Follett, Morrow and New American have failed to prove that the parties agreed on such an attribution as a binding restriction. The testimony demonstrates that at the time of the discussions concerning attribution, Follett sought to have his name displayed as prominently as possible, as was natural for an aspiring author who at the time was relatively unknown. Collins and Star acceded to his demands only to the extent of permitting the use of his name on the title page in the

form "Rene Louis Maurice with Ken Follett." Follett, Morrow and New American have not established that this compromise constituted an agreement among the parties to restrict the publisher's right to display Follett's name.

■ Follett contends that Arbor House has not proved that it has a right to publish the manuscript of *The Heist of the Century*, since it has not proved compliance with paragraph 24 of the Star/Collins publishing agreement. Paragraph 24 provides:

> On payment by the Owner [Star] to the Publisher [Collins] of the full cost of retaining Mr. Ken Follett to edit the said work, which sum is [850 pounds] the Owner shall be free to arrange for the sale of translation rights in the said work.
>
> . . .

Follett argues that since there is no proof that Star reimbursed Collins the 850 pounds in accordance with paragraph 24, Star acquired no rights in the English version of the book. Even assuming that Star did fail to compensate Collins, that failure would give rise only to a breach of contract action by Collins against Star for 850 pounds. Follett has no standing to assert that alleged breach of contract in this action.

■ Similarly, Follett has argued that Arbor House has not met its burden of showing that Star has a right to license it to publish *The Gentlemen of 16 July*. Since Follett has no copyright interest in the book, any defect which may exist in Star's chain of title to the copyright in the manuscript is irrelevant to his rights in this action.

Follett, Morrow and New American seek to characterize the intended publication by Arbor House as a violation of section 51 of the New York Civil Rights law, which provides in part:

> Any person whose name . . . is used within this state for . . . the purposes of trade without the written consent [of that person] . . . may maintain an equitable action . . . against the . . . corporation so using his name . . . to prevent and restrain the use thereof . . . .

This is not a case involving an express restriction on use of plaintiff's name. *See Bernham v. Bernham-Stein Furs, Inc.,* supra. Nor is this a case in which the plaintiff's name has been appropriated for a use substantially different from that which he initially authorized. *See Miles v. Sears, Roebuck & Co.,* 61 A.D.2d 929, 403 N.Y.S.2d 18 (1st Dep't 1978) (unauthorized publication of brochure containing pictures of and tips by plaintiff derived from authorized manual); *Goldberg v. Columbia Broadcasting System,* 25 Misc.2d 129, 205 N.Y.S.2d 661 (N.Y.Co.Sup.Ct.1960). The evidence shows that at the time Follett consented to use of his name for the British publication of *The Heist of the Century,* a sale of rights for publication in the United States was contemplated. In addition, paragraph 24 of the Star/Collins agreement specifically refers to the sale of translation rights in the manuscript.

Both *Shostakovich v. Twentieth Century-Fox Film Corp.,* 196 Misc. 67, 80 N.Y.S.2d 575 (N.Y.Co.Sup.Ct.1948), *aff'd,* 275 A.D. 692, 87 N.Y.S.2d 430 (1949), and *Ellis v. Hurst,* 145 A.D. 918, 130 N.Y.S. 1110 (1st Dep't 1911), hold that an author has no right under the Civil Rights law to restrict the use of his name to indicate his authorship of work as to which he possesses no copyright. Moreover, this case differs from *Ali v. Playgirl, Inc.,* 447 F.Supp. 723 (S.D.N.Y.1978), and *Durgom v. Columbia Broadcasting System, Inc.,* 29 Misc.2d 394, 214 N.Y.S.2d 752 (N.Y.Co.Sup.Ct.1961) in which the plaintiffs gained injunctions against the use of their names in contexts unrelated to their own activities. Here, of course, Follett prepared the manuscript now sought to be published under the title *The Gentlemen of 16 July.*

In *Gieseking v. Urania Records, Inc.,* 17 Misc.2d 1034, 1035, 155 N.Y.S.2d 171 (N.Y. Co.Sup.Ct.1956), the court suggested that an author has a right under the New York Civil Rights law to ensure that any attribution to him accurately reflects his contribution to a manuscript. The court stated, "A performer has a property right in his performance that it shall not be used for a

purpose not intended, and particularly in a manner which does not fairly represent his services." By analogy, it may well be that Follett is entitled to an accurate description of his role in preparing *The Gentlemen of 16 July*. Any rights which he may hold in this regard are co-extensive with his right under the Lanham Act, discussed below.

Arbor House and Meredith contend that the Lanham Act issues in this case are controlled by a determination as to whether Follett's version of *The Heist of the Century* was copyrightable under the Copyright Act, 17 U.S.C. §§ 101 *et seq.* They urge that Follett's version could have been copyrighted, since in a non–fiction work such as *The Heist of the Century*, the right to obtain a copyright derives from the form of words in which events are recounted, and not from the interpretation of the events themselves. *See Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980). Arbor House and Meredith point out that the form of the script after Follett's editing differs substantially from that which he received as to the words used, the order of events, the development of characters and the depiction of events, so that Follett's edited version was copyrightable. *See L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486 (2d Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

■ However, the analysis of whether an editing or rewriting of an existing manuscript is copyrightable should not control the Lanham Act issue presented here. As the Court of Appeals has stated,

> The test of originality [for purposes of the Copyright Act] is concededly one with a low threshold in that "[a]ll that is needed . . . is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'"

*L. Batlin & Son, Inc. v. Snyder, supra* at 490, *quoting Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 103 (2d Cir. 1951). Although an edited version would apparently be copyrightable so long as the editor's alterations were more than "merely trivial," it could still be misleading to designate that editor as the principal author of the work. Thus the fact that Follett sought and might have been entitled to obtain a copyright interest in his edited version is not dispositive of the issue before the court.

The parties have submitted conflicting evidence as to trade practices in the publishing industry. Meredith and Arbor House contend that if an individual makes a contribution to a literary work which bears certain indicia of authorship, that person can be described as an author and the form of attribution rests within the discretion of the publisher. Follett, New American and Morrow have presented evidence that even the substantial revisions performed by Follett amount to no more than what is customarily performed by freelance editors. They contend that such alterations rarely, if ever, result in the editor's receiving authorship credit.

These industry practices are largely irrelevant to the issues in this case. Even if an attribution of authorship were consistent with industry practices, it would nevertheless be illegal under the Lanham Act if it misrepresented the contribution of the person designated as author.

The key issue, then, is whether the designation of authorship which Arbor House proposes to utilize on the cover of *The Gentlemen of 16 July* constitutes a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That section provides in pertinent part as follows:

> (a) any person who shall affix . . . or use in connection with any goods . . . or any container . . . for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods . . . to enter into commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Section 43(a) is designed to provide a statutory cause of action for false description or advertisement of goods by any person likely to be injured by such description or advertising, *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978). In order to determine whether a description or representation is false, a court should first assess the meaning of particular representations and then determine whether the claims made are false. *Id.* at 164–167. Where a description concerning goods is unambiguous, the court can grant relief based on its own findings of falsity without resort to evidence of the reaction of consumers of the goods. *American Brands, Inc. v. R.J. Reynolds Tobacco Company*, 413 F.Supp. 1352, 1356 (S.D.N.Y. 1976). Moreover, in order to obtain injunctive relief under the Lanham Act, a plaintiff need only establish a "likelihood of confusion or a tendency to mislead." *American Brands Inc. v. R.J. Reynolds Tobacco Company, supra* at 1356; *Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261, 268 (S.D.N.Y.1968).

The attribution of authorship of *The Gentlemen of 16 July* as designated on the cover and title page of the book and in Arbor House's advertisements, contains an unambiguous representation that Follett is the principal author of the book. The name Ken Follett is printed in bold typeface approximately 15 mm. high. The subtitle, "with Rene Louis Maurice," is printed in much smaller type and is only 6 mm. in height. Above Ken Follett's name, the notation "by the author of TRIPLE and EYE OF THE NEEDLE" appears in type 4 mm. high. The name Ken Follett appears on the spine of the book unaccompanied by any reference to "Rene Louis Maurice." This attribution clearly indicates that Ken Follett is the principal author of the book.

The concept of authorship is elusive and inexact. Although I do not presuppose to offer a definitive analysis of qualities which give rise to authorship, some such definition is essential to a resolution of the issue before the court. The parties have cited no cases in which the concept of authorship has been carefully dissected, and this court has discovered none.

■ Arbor House and Meredith contend that Follett is the principal author of *The Gentlemen of 16 July* because of his substantial contribution to the form of the book. The actual words used in the final draft were supplied in large measure by Follett. Follett altered the method of telling the story by shifting the chronology and removing flashbacks. The characters are more vividly portrayed in Follett's edited version than in the draft he received. Follett has modulated the unfolding of events carefully in order to achieve what Fine described as "narrative drive" and to enhance the dramatic effect of the plot. Follett's contribution bears certain indicia of authorship. His alterations were substantial, and the finished product bears the mark of his style and craftsmanship.

Yet, these refinements are not sufficient to render Follett the principal author of the book. Authorship connotes something more than style, form and narrative approach. It includes a special element of creativity, of the definition of scope and content. In this case, Follett received a fixed plot, a cast of characters and a set of themes and reworked these elements to make them more palatable and comprehensible to the intended audience. He neither conceived the framework or format of the book, nor played a substantial role in selecting the material to be included. Almost every significant occurrence, personality and theme can be traced directly to the materials from which Follett worked.

As a result, although Follett's revisions may have been more substantial than those which an editor would ordinarily perform in correcting, polishing and revising, it is misleading to depict him as the principal author of *The Gentlemen of 16 July*. His contributions display none of the special creative attributes which are associated with authorship. Thus, the representation that Follett is the principal author of the book is literally false.

In *Benson v. Paul Winley Record Sales Corp.*, 452 F.Supp. 516 (S.D.N.Y.1978), a

record producer altered an old recording of a band in which the plaintiff was a minor musician to make it appear that plaintiff had been the lead guitarist. Erotic tones were superimposed onto the old recording. The court granted a preliminary injunction against publication of the new release since the distortion of the old recording falsely indicated that Benson had played a major role in that recording. In this case, as in *Benson*, the attribution on the cover and title page of *The Gentlemen of 16 July* falsely makes it appear that Follett was the major author of the book.

In *Landon v. 20th Century–Fox Film Corp.*, 384 F.Supp. 450 (S.D.N.Y.1974), a motion picture company gained the right to adapt plaintiff's book for television. The television series was advertised to be "based on" plaintiff's work. The court refused to grant an injunction against use of this attribution since, despite substantial revision of the theme of the story, the representation that the series was based on the book was true. But the court noted that "plaintiff would have [had] a valid claim against defendants if they had falsely attributed the authorship of the series to her . . ." *Id.* at 459.

The Lanham Act, as construed in *Benson* and *Landon*, is designed not only to vindicate "the author's personal right to prevent the presentation of his work to the public in a distorted form," *Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14 (2d Cir. 1976), see *Jaeger v. American International Pictures, Inc.*, 330 F.Supp. 274 (S.D.N.Y.1971); *Geisel v. Poynter Products, Inc.,* supra at 267, but also to protect the public and the artist from misrepresentations of the artist's contribution to a finished work.

Based on the facts found and legal conclusions reached, judgment will be granted in favor of Follett, Morrow and New American. Although the court must proceed cautiously in dictating the form of presentation of *The Gentlemen of 16 July*, some accommodation is essential to assure that the public will not be misled by the attribution of authorship, yet protect Arbor House's

legitimate commercial interests in publication of the work. Arbor House will be required to give equal attribution to Rene Louis Maurice and Ken Follett, in that order, and to indicate on the cover and jacket that the work is non–fiction.

In the absence of substantial evidence of unfair trade disparagement and in view of the facts and conclusions contained in this opinion, judgment will be granted dismissing the complaint and the counterclaims of Arbor House. Settle judgment on notice.

So ordered.