**WALDMAN PUBLISHING CORP.
and Playmore Inc., Publishers,
Plaintiffs,**

v.

**LANDOLL, INC., Defendants.**

**No. 94 Civ. 2022 (CSH).**

United States District Court,
S.D. New York.

April 8, 1994.

Meltzer, Lippe, Goldstein, Wolf, Schlissel & Sazer, P.C., Mineola, NY, for plaintiffs; Charles Guttman, Loretta M. Gastwirth, Danielle Laibowitz, of counsel.

James and Franklin, New York City, for defendants; Robert L. Epstein, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs are publishers and distributors of "classic" literary works adapted in shorter form and illustrated for children. Defendant publishes and distributes a competing product.

Plaintiffs assert that defendant's conduct violates section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). They also assert claims for unfair competition under the common law and section 368-d of the New York State General Business Law. Plaintiffs filed their complaint in New York State Supreme Court, New York County. They sought a temporary restraining order and a preliminary injunction. Before the state court could hear the case, defendant removed it to this Court. I granted a restraining order on March 25, 1994 and conducted an evidentiary hearing on the preliminary injunction motion on March 30 and 31 and April 4 and 5. For the reasons which follow, a preliminary injunction will issue.

## THE FACTUAL BACKGROUND

Plaintiff Waldman Publishing Co. ("Waldman") publishes children's books. Plaintiff Playmore Inc. ("Playmore") sells and distributes books for Waldman.

Defendant Landoll Inc. ("Landoll") publishes, prints and sells children's books.

Waldman publishes and Playmore sells and distributes a series of books called "Great Illustrated Classics." These are retold and abbreviated versions of literary works printed in hard cover format, 5⅝ inches by 8 inches, each 240 pages in length, with a color illustration on the cover and black-and-white illustrations opposite each page of text.

Plaintiffs also publish, print and sell soft cover versions of the books in a series called "Illustrated Classic Editions." These books contain the same text and illustrations but are reduced in size, measuring 4½ inches by 5½ inches.

Plaintiffs began selling the soft cover series in 1979 and the hard cover series in 1990. There are 36 titles currently in print in the soft cover series and 35 in the hard cover series, with another eight titles in production.

Plaintiffs sell these products to retail outlets such as K–Mart, Wal–Mart, toy stores, drug stores, and book stores. They have been highly successful. Plaintiffs sell between 4 million and 6 million copies a year, divided equally between hard and soft covers.

Among the titles plaintiffs publish and sell, in each series, are "Oliver Twist," "Robin Hood," "The Mutiny on Board H.M.S. Bounty" (the Bligh account, not that of Nordhoff and Hall), "Black Beauty," "Swiss Family Robinson," and "David Copperfield."

The adaptation of books such as these into versions for children comprising 120 pages of text and 120 illustrations requires a number of steps. Some parts of the narrative are retained; others are discarded. The text is revised to be more comprehensible to children. Decisions must be made as to what the illustrations will show. Waldman contracted with writers to adapt the text and artists to do the illustrations. These individuals are identified at the beginning of the books. Each book also contains a printed notice of copyright on behalf of Playmore and Waldman for the cover, and on behalf of Waldman for the text. However, plaintiffs have not as yet registered the works with the Copyright Office.

In December 1993 Landoll published and offered for sale soft cover illustrated adaptations of these six books in a series called "First Illustrated Classics." In January 1994 Landoll published and offered for sale the same six adaptations in hard cover, in a series called "Illustrated Classics." At a book fair in May 1993 Landoll had displayed prototypes of these series, but the display was limited to the illustrated covers, enfolding blank paper. Plaintiffs' witnesses testified, and I find, that plaintiffs did not become aware of the inner texts and illustrations of

**500**

defendant's books until February 1994. They filed suit in March. In these circumstances, I reject defendant's suggestion that plaintiffs deliberately delayed the filing of suit in order to maximize defendant's disruption during an important selling season.

Plaintiffs' grievances relate not to the illustrated covers of defendant's books, which plaintiffs acknowledge are sufficiently different from theirs to avoid legal challenge. Rather, plaintiffs focus upon the texts and illustrations accompanying the texts.

Landoll's president Marty Meyers testified, and I find, that Landoll obtained the texts and illustrations for these six adaptations from one Peter Haddock, an English publisher. While on a business trip to London in March 1983, Meyers agreed to purchase the adaptations from Haddock on a "camera ready" basis. That means Haddock sent the texts and the illustrations (cover and internal) to Landoll, which used its own facilities to print them in salable form as finished books. Meyers testified, and I find, that no one at Landoll had any input with respect to the contents of the books. Landoll is obligated to pay Haddock a royalty of one cent per book sold.

Landoll displays its apple-like logo on the outside of its books. Each book identifies a writer by whom the book was "retold" and the illustrator. Landoll includes a printed notice of copyright in its own name. As with plaintiffs, Landoll has not registered its books with the Copyright Office.

Plaintiffs contend that the texts and illustrations of the Landoll books so closely resemble their own that the Landoll books must be regarded as copies of plaintiffs' books. In addition to the common law and state law claims, plaintiffs asserted two Lanham Act violations as bases for preliminary injunctive relief: reverse passing off and infringement of trade dress. In summation following the hearing, plaintiffs' counsel withdrew trade dress infringement as a basis for a preliminary injunction, although plaintiffs have not abandoned the claim. The issue in the Lanham Act context, therefore, is whether plaintiffs have made a sufficient showing of reverse passing off and the other requisite elements to entitle them to an injunction.

Landoll contends that its conduct does not violate the Lanham Act. It also contends that plaintiffs' common law and state law claims are preempted by section 301(a) of the Copyright Act, 17 U.S.C. § 301(a).

### DISCUSSION

*The Lanham Act Claim*

Section 43 of the Lanham Act, 15 U.S.C. § 1125, provides in pertinent part:

> (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, of any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...
>
> > \* \* \* \* \* \*
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 43(a) of the Lanham Act "created a new statutory tort of false representation of goods in commerce." Its language is "strikingly general"; and, "because the statute is remedial and because its words are so clearly expansive it should, generally speaking, be broadly construed." *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124 (2d Cir.1984). The section "has been employed successfully to combat a wide variety of deceptive commercial practices." *PPX Enterprises, Inc. v. Audiofidelity Enterprises*, 818 F.2d 266, 270 (2d Cir.1987). "These practices traditionally involve the misappropriation of another's talents." *Merchant v. Lymon*, 828 F.Supp. 1048, 1059 (S.D.N.Y.1993).

██ One of the deceptive practices actionable under section 43(a) is that form of false designation of origin known as "reverse palming off" or "reverse passing off." In

reverse passing off, the wrongdoer sells plaintiff's products as its own. It contrasts with passing off, where the wrongdoer sells its products as the plaintiff's. A phonograph record album creating the false impression that defendant rather than plaintiff was the principal performer constitutes reverse passing off, actionable under section 43(a). *Sims v. Blanchris,* 648 F.Supp. 480, 482 (S.D.N.Y. 1986). More pertinent to the case at bar, a book which fails "to attribute authorship to a co-author resulting in only a partially accurate designation of origin constitutes reverse palming off within the ambit of section 43(a)." *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 243 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990). See also *Debs v. Meliopoulos,* No. 1:90–939C, 1993 WL 566011 (N.D.Ga. Dec. 18, 1991) (same); *Feerick v. Arthur Young & Co.,* 715 F.Supp. 1234, 1236 (S.D.N.Y.1989) (claim that book contained false attribution of editorial credit cognizable under section 43(a)); *Follett v. New American Library,* 497 F.Supp. 304 (S.D.N.Y.1980) (false attribution of principal authorship had a tendency to mislead the public and was therefore actionable under the Lanham Act.).

The concept of reverse passing off is of broad dimension, limited only by the ingenuity of wrongdoers seeking to mislead. *See, e.g., Williams v. Curtiss–Wright Corp.,* 691 F.2d 168, 172 (3d Cir.1982) ("A false designation of origin in the form of reverse palming off is prohibited by the Lanham Act"; defendant passed off plaintiff's replacement jet engine parts as its own); *Arrow United Industries v. Hugh Richards, Inc.,* 678 F.2d 410, 415 (2d Cir.1982) (where competing machinery manufacturers were bidding on public contract, "Arrow's contention that Richards did little more than reduce the size of the standard Arrow–Foil damper and affix upon the result Richards' own identifying marks presents sufficiently serious questions going to the merits of Arrow's Lanham Act claim to make them a fair ground for litigation."); *Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir.1981) (defendants' conduct in removing plaintiff film actor's name from all credits and advertisements for film in which he appeared and substituting a name of their own choosing constituted reverse passing off actionable under section 43(a)).

■ In the case at bar, the evidence demonstrates the likelihood of plaintiffs' success on their claim that Landoll has committed the Lanham Act tort of reverse passing off. I base that conclusion upon the similarities between the structure, texts and illustrations of the competing adaptations: similarities that are too striking to ascribe to coincidence.

The arrangements of chapters mirror each other in each pair of books. In addition, the Landoll texts closely follow the Waldman texts. The rival adaptations of "The Swiss Family Robinson" are typical. The opening paragraphs of the Waldman adaptation read:

> Many years ago my family left Switzerland and boarded a ship bound for the sparkling blue waters of the Pacific Ocean. Our destination was an island near New Guinea, where we were to establish a colony. Along the way we ran into a violent storm.
>
> For six days, the wind howled and tore at the sails, while the waves pounded against our little wooden ship, tossing it high in the air.
>
> On the seventh day, the masts ripped apart and fell into the sea. Several leaks appeared and the ship began to fill with water. Realizing that the storm had driven us far off course, the frightened sailors fell to their knees in prayer.

The opening paragraphs of the Landoll book read:

> Many years ago my family and I left our beloved Switzerland to found a settlement on a small island in the Pacific Ocean, not far from New Guinea.
>
> After several weeks at sea we were caught in a raging storm that lasted for six days. The ship was blown far off course and the captain was unable to fix our position. At dawn, on the seventh day of the storm, the winds grew more violent, snapping the masts and hurling them into the sea. The ship began to leak dreadfully and the terrified sailors gave them selves up for lost and fell on their knees in prayer, asking God to save them from their desperate plight.

The closing paragraphs of the Waldman volume read:

> For eight days, the Unicorn remained at anchor while we packed a valuable cargo of pearls, spices, furs, and ivory for our sons to sell in Europe.
>
> And then came the day when the ship was to sail. · A cannon blast announced the hour of departure. After may handshakes and tender hugs, Fritz and Francis climbed aboard. They stood on the deck waiving good-bye.
>
> "Have a good trip!" we cried as the Unicorn slowly slipped away.
>
> We watched until the ship was merely a black speck on the horizon.
>
> "Good-bye, my sons," Elizabeth and I whispered, brushing the tears away.
>
> It was a sad moment, for we knew in our hearts that we had said our last farewell to Europe and our beloved Switzerland.

The closing paragraphs of the Landoll book read:

> The "Unicorn" stayed at anchor in the bay for seven more days. During that time we carefully packed and loaded all the ivory, pearls, furs and spices that we had collected over the years. Our sons would sell these precious goods in Europe to provide for their future.
>
> At dawn on the eighth day a shot from the cannon announced that the ship was ready to depart. Sadly, we said our goodbyes, tenderly embracing Fritz, Francis and Jenny for the last time.
>
> Good-bye, dear loved ones. May God bless you and keep you safe," we whispered softly.
>
> The "Unicorn" weighed anchor and we watched her sail out across the bay and disappear over the horizon, taking with her our last farewell to Europe and dear Switzerland, our own, beloved, native land.

The middle of the Waldman book contains an episode in which Jack, a Robinson son, is caught in quicksand and rescued by the family's resourceful mule Grizzle. The Waldman book's version of the incident reads:

> As · Jack slowly sank into the quicksand, only Grizzle . heard his frantic cries for help. The poor bewildered mule came running to the edge of the marsh, where he stood braying loudly.
>
> Realizing now that no one could hear him beyond the dense wall of willow trees that surrounded him, Jack made one last effort to save himself. Twisting and turning, he managed to get his knife out of his pocket and cut two large bundles of willow twigs. These he wedged under his arms. Miraculously, they buoyed him up so that he was actually able to make some headway toward dry ground.
>
> He whistled softly to Grizzle, who inched closer and closer. Then, Jack grabbed the mule's tail and clung for dear life. As Grizzle tugged and pulled, Jack felt himself being carried forward. In a matter of minutes, he was on safe ground.

Two illustrations in the Waldman book depict this incident. They are reproduced as Appendix A to this opinion.

The quicksand incident in the Landoll book is recounted in these words:

> The more Jack struggled to get out, the more deeply he sank into the quicksand. Hearing his desperate cries for help Grizzle ran to the edge of the swamp and began to bray loudly but no one else heard them at all. Then Jack, in a final attempt to save himself, cut down all the reeds he could reach and pushed them under his arms. Fortunately the reeds kept him from sinking any further and, using them as a support, he was able to make some progress towards firmer ground. He called Grizzle who came close enough for Jack to seize his tail. Then the donkey pulled hard and dragged Jack safely to dry land.

The Landoll volume's illustrations depicting the incident are reproduced as Appendix B.

Similarities such as these, which are characteristic of the competing series [1], compel the inference that the Landoll adaptations are copies of the Waldman adaptations, with

---

1. The text of the Landoll "Robin Hood" does not track the text of the Waldman version quite as precisely as the texts of "Swiss Family Robin-son" and the other four works, but the arrangement of chapters and the illustrations are comparably close.

the minimal changes intended to disguise the copying. Furthermore, evidence of copying consists not only of these similarities of text and illustrations. As noted, the adaptation and condensation of a long original work require editorial selection of the incidents and descriptions to include and those that will be omitted. The Landoll books required no such editorial effort because they are copies of the Waldman books.

The Landoll books do not attribute their editorial structure, texts and illustrations to those individuals who created them. On the contrary: the Landoll books identify different individuals as the adapters and illustrators; they display on their covers the Landoll logo; and the inner pages contain a Landoll notice of copyright which, in the circumstances of the case, must be regarded as false. This conduct constitutes reverse passing off. Landoll is selling the Waldman products as Landoll's own and under Landoll's name.[2]

Counsel for Landoll argued in summation that reverse passing off occurs only "if you take the physical product of another" and "sell it as your own."[3] On that theory, counsel argued, ripping the cover off a Waldman book and replacing it with a Landoll cover would constitute reverse passing off "because then you're taking the actual product; and, that one is not allowed to do." But reverse passing off would not be established, in counsel's view, if Landoll took the Waldman text and illustrations and had them reprinted, even without any changes, since "reverse passing off is when you physically take the other guy's product and put it in your package."[4] That narrow construction is inconsistent with the Lanham Act's broad remedial purpose, and contrary to the weight of authority, in this Court and elsewhere, defining and condemning reverse passing off as a form of false designation of origin. The Landoll books falsely fail to designate the Waldman books as the origin of the adaptations Landoll is selling in its own name. Such conduct is actionable under section 43(a).

■ In evaluating plaintiffs' entitlement to preliminary injunctive relief, I apply the traditional criteria. Plaintiffs must demonstrate (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Hasbro, Inc. v. Lanard Toys, Inc.,* 858 F.2d 70, 73 (2d Cir.1988). In Lanham Act cases, "[i]n order to state a claim for injunctive relief, plaintiffs must demonstrate a likelihood of deception or confusion on the part of the buying public caused by the false description or representation." *PPX Enterprises v. Audiofidelity Enterprises, supra,* at 818 F.2d 271.

■ Where the claimed Lanham Act violation involves defendant's use of a trademark or trade name similar to that of plaintiff, the likelihood of consumer confusion as to source is traditionally analyzed in the light of the *"Polaroid"* factors. *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see, e.g., Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541 (S.D.N.Y.1991) and cases cited. But reverse passing off does not require that form of analysis. Landoll is not selling its own product under a trademark or trade name or trade dress confusingly similar to that of the plaintiffs. Landoll has simply misappropriated Waldman's product and is selling it as its own, without any attribution of credit to the true sources. The Lanham Act condemns conduct which is likely to cause consumers to be confused, mistaken or deceived as to a product's origin. It is frequently stated that to state a claim for injunctive relief in an unfair competition claim under section 43(a),

---

**2.** There is no evidence that Landoll employees had anything to do with the copying. The proof at the hearing indicates that Landoll received the texts and illustrations from Haddock in England, and simply reproduced them. But Landoll is now aware of the similarities, and professes its intent to go right on selling the books. It is accordingly committing the tort of reverse passing off, even though the tools to accomplish that tort were fashioned by other hands.

**3.** Transcript of summation at 369.

**4.** *Id.* at 370–71.

a plaintiff need only establish a "likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1321 (2d Cir.1987) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). It is inherent in Landoll's conduct that purchasers of the Landoll adaptations of these classic works will, as the result of Landoll's deceitful marketing, mistakenly believe that Landoll created the adaptations. That is a sufficient showing of impact upon consumers to justify injunctive relief.[5]

■ Section 43(a) requires plaintiffs to show that they are or are likely to be damaged by Landoll's acts. Again, damage to plaintiffs is inherent in Landoll's conduct. It is reasonable to assume that most of the Landoll adaptations sold at retail would have been Playmore sales if the Landoll alternative had not been available. Because plaintiffs' damages cannot be accurately quantified, they are irreparable in nature.

In *Rosenfeld* Judge Cannella, citing and quoting *Smith v. Montoro, supra,* said that

the gravamen of the harm in a reverse palming off case is that "the originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." *Id.* at 607. The harm, however, also runs

to the ultimate purchaser who is "deprived of knowing the true source of the product and may even be deceived into believing that it comes from a different source." *Id.*

These consequences of reverse passing off apply equally to the case at bar. Plaintiffs are entitled to a preliminary injunction on their Lanham Act claim.

*The Common Law and State Law Claims*

■ Defendant argues that the Copyright Act preempts plaintiffs' common law claim.[6] I agree.

Section 301(a) of the Copyright Act expressly preempts

all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103.... 17 U.S.C. § 301(a).

The preemptive sweep of section 301(a) is limited by section 301(b):

Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to ... activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.... 17 U.S.C. § 301(b)(3).

A common law or state statutory cause of action is not "equivalent", and hence, not preempted, if it requires proof an "extra element" that changes the "nature of the

---

**5.** Judge Cannella denied a preliminary injunction in *Rosenfeld v. W.B. Saunders, supra,* because the disclaimer at the beginning of the medical treatises at issue, together with attributions to the original author in the preface and dedication, mitigated "against any potential confusion as to the true source of the work," particularly on the part of "doctors, hospitals, and medical libraries.... The fact that the market for the [defendant's] work consists of relatively sophisticated buyers, coupled with the attribution to Dr. Converse in the preface and dedication, prevent any potential consumer confusion." 728 F.Supp. at 244. In the case at bar, the Landoll books carefully avoid any attribution, and the consumers are unsophisticated in the field of literary adaptation: parents, siblings, even the

children themselves, for whom the books are targeted. Anyone who does not understand that a child makes purchasing decisions has never tried to explain to one that an item presented for payment at the check-out station must be returned to the shelves.

**6.** Plaintiffs also bring suit under New York General Business Law § 368–D, which provides a cause of action for dilution of trade dress. At the conclusion of the hearing plaintiffs withdrew their trade dress claims as a basis for their request for a preliminary injunction. Since the trade dress claim is not presently before the Court, I need not decide whether a state antidilution claim is preempted by the Copyright Act.

action so that it is qualitatively different from a copyright infringement claim." *See Computer Associates International, Inc. v. Altai,* 982 F.2d 693, 716 (2d Cir.1992), quoting *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1535 (S.D.N.Y.1985).

Plaintiffs argue that their common law claim is not preempted because one of the elements required for a claim of "passing off" is the misrepresentation of a common source, which is not an element of a cause of action for copyright. There is authority for the proposition that state law claims of "passing off" are not preempted by the Copyright Act. *See Warner Brothers v. American Broadcasting Company,* 720 F.2d 231, 247 (2d Cir. 1983) ("to the extent that plaintiffs are relying on state unfair competition law to allege a tort of 'passing off', they are not asserting rights equivalent to those protected by copyright and therefore do not encounter preemption."); *see also* 1 Nimmer on Copyright § 1.01(B)(1)(e) ("There is no preemption . . . of the state law of unfair competition of the 'passing off' variety.").

Plaintiffs, however, have not pled a traditional passing off claim, but a reverse passing off claim. Where a plaintiff claims that defendant has copied plaintiffs' product and sold it under defendant's name, that claim of reverse passing off is preempted by the Copyright Act. *See Kregos v. Associated Press,* 3 F.3d 656, 666 (2d Cir.1993) (false designation of ownership claim based solely on defendant's copying of plaintiff's protected expression was preempted); *Computer Associates,* 982 F.2d at 717 (unfair competition and misappropriation claims grounded solely in the copying of plaintiff's protected expres-

sion are preempted by section 301); *Walker v. Time Life Films,* 784 F.2d 44, 53 (2d Cir.1986) (plaintiff's state law claim that defendant's movie was copied from his book was preempted); *Xerox Corp. v. Apple Computer,* 734 F.Supp. 1542, 1550 (N.D.Cal.1990) (reverse passing off claim, where plaintiff alleged it was the constructive author of defendant's product, was preempted by Copyright Act). Nimmer is not to the contrary:

> If A claims that B is selling B's products and representing to the public that they are A's, that is passing off. If, by contrast, B is selling B's products and representing to the public that they are B's [when presumably they are A's], that is not passing off. A claim that the latter activity is actionable because B's product replicates A's, even if denominated "passing off" is in fact a disguised copyright infringement claim, and hence preempted.

1 Nimmer on Copyright, § 1.01(B)(1)(e), n. 10. Plaintiffs' common law claim is indistinguishable from the above cited cases. Accordingly, I find that plaintiffs' common law claim is preempted by the Copyright Act.

*Conclusion*

For the foregoing reasons, a preliminary injunction will issue under the Lanham Act.

Plaintiffs' counsel are directed forthwith to settle an order of preliminary injunction consistent with this opinion on three (3) days' notice. The temporary restraining order is hereby extended for an additional ten (10) days from today.

It is So Ordered.

APPENDIX A

Grizzle Pulls Jack to Safe Ground.

Willow Twigs Buoy Up Jack.

APPENDIX B

