OPINION OF THE COURT
Harold Baer, Jr., J.
Defendant Yoko Ono Lennon moves, pursuant to CPLR 3211 *231 (a) (7), to dismiss plaintiff Adam Ippolito’s complaint. The complaint alleges four causes of action: invasion of privacy (Civil Rights Law §§ 50, 51), fraudulent misrepresentation, conversion and unfair competition (consisting of misappropriar tion of property rights and "palming off”). Subsequent to the initial return date of the motion, a motion was made by Extraordinary Event, Inc., doing business as One-to-One (hereinafter referred to as the producers or Extraordinary Event), pursuant to CPLR 1013, for leave to intervene.
Turning first to the motion brought by defendant seeking dismissal of all causes of action in the complaint pursuant to CPLR 3211 (a) (7), the Court of Appeals has stated that "a complaint should not be dismissed on a pleading motion so long as, when the plaintiff is given the benefit of every possible favorable inference, a cause of action exists.” (Rovello v Orofino Realty Co., 40 NY2d 633, 634 [1976].)
Although defendant seeks to convert this motion to one for summary judgment, pursuant to CPLR 3211 (c), the rule, at least in this Department, is that notice of an intention to treat the motion as such must come directly from the court (see, Four Seasons Hotels v Vinnik, 127 AD2d 310 [1st Dept 1987]); no such notice was given by the court. Therefore, the motion will not be treated as one for summary judgment.[1]
The action arises out of two charity rock concerts given at Madison Square Garden on August 30, 1972 to raise money for the Willowbrook Home for retarded'children as part of a fund-raising effort known as "One-to-One”. The concerts received extensive publicity as they featured performances by defendant and her late husband, John Lennon. The Lennons, in conjunction with Geraldo Rivera (Chairman of the Board of Extraordinary Event) and ABC, organized the concerts and the performances which helped raise over $1.5 million for the Willowbrook Home. The concert was later televised in December 1972 on ABC Television from a film of the concert made by Joko Film, Inc. (owned by the Lennons).
Plaintiff is a professional musician and pianist who was a member of the Elephant’s Memory Band, which performed as the band backing up the Lennon vocals at the concerts. According to plaintiff, he agreed to donate his services upon the representation that the concerts and the telecast would *232 not be exploited commercially, i.e., were for charitable purposes only. Plaintiff claims that despite this "donation” he was compelled to accept union scale wages as dictated by the Musicians Union’s rules.
According to plaintiff, although defendant sat at an electric piano throughout the concerts, the power had been turned off and all the playing except for a limited performance by John Lennon was done by plaintiff, while the defendant feigned playing throughout. The plaintiff claims he went along with this pretense because of the charitable nature of the event. In 1985, 13 years later, however, defendant is said to have delivered the film and sound track of the benefit performances to Capitol Records and Sony Corporation for commercial reproduction as a record album and videotape. Furthermore, plaintiff claims that the film and sound track were also given to Showtime/The Movie Channel, Inc., for airing in March 1986 on "Showtime” (a cable television station). A press release and the jackets of the album and videotape each make reference to plaintiff by name as one of the performers, however, plaintiff claims that no written authorization for use of his name had been given. According to plaintiff, at no time had he sold or assigned his property rights in his performance at the concerts to defendant, and, therefore, defendant has violated sections 50 and 51 of the New York Civil Rights Law by exploiting his name and has, converted and misappropriated his property rights in the film and sound track. Furthermore, he claims he was fraudulently induced to perform, having been told that the performance was for charity only and claims that he never would have gone along with the "palming off” of plaintiff’s piano playing for defendant’s own had he known that defendant intended to commercially exploit the performances at a later date.
The defendant claims that plaintiff was covered by a "work-for-hire” contract specifically waiving any property interest of plaintiff’s in the performance. Plaintiff denies having signed the two-page, preprinted form agreement, dated August 30, 1972 and entitled "Exhibit 'D’ — Actors Television Motion Picture Minimum Free Lance Weekly Contract.” The clause in question is contained in paragraph 3 and reads as follows: "Producer [An Extraordinary Event, Inc.] shall have the unlimited right throughout the world to telecast the film or exhibit the Film theatrically, in accordance with the terms *233 and conditions of the Screen Actors Guild 1967 Television Agreement” (herein referred to as the Television Agreement).[2]
The express intent of the SAG 1967 Television Agreement is to set out the minimum wage scale and working conditions for all persons employed in "television motion pictures.” (See? SAG 1967 Television Agreement para 1.) "Television motion pictures” are defined as: "entertainment motion pictures produced primarily for exhibition over free television whether made on or by film, tape or otherwise, and whether produced by means of motion picture cameras, electronic cameras or devices, or any combination of the foregoing, or any other means, methods or devices now used or which may herein after be adopted.” (Id.)
The plaintiff asserts that even if he did sign the release as defendant claims, it only gives his permission for the telecast of the concert (which occurred in Dec. 1972). This is based on plaintiff’s reading of the SAG agreement concluding that it governs the original telecast and any reruns of the telecast, but not the videotape, album or cable television special, which are derivatives of the film and sound track. In plaintiff’s favor' is paragraph 32 of the SAG 1967 Television Agreement which is subtitled: "Re-Use of Photography or Sound Track (Other Than Re-Run or Theatrical Exhibition Or Foreign Telecast)”.. That paragraph states in pertinent part: "(a) No part of the photography or sound track of a player shall be used in any picture, or other programs, whether filmed, taped, live or in any other medium, other than the one for which he was employed, without separately bargaining with the player, and reaching an agreement regarding such use, prior to the time re-use is made. The player may not agree to such re-use at the time of original employment. The foregoing shall apply only if the player is recognizable, and as to stunts, only if the stunt is identifiable.”
In a separate agreement between Extraordinary Event and Joko Films, dated September 7, 1972, Joko Films was engaged to film the concerts.[3] The agreement provides in pertinent part:
*234 "(6) Should Joko repurchase the Special [the film of the concerts] under the terms of the letter agreement or acquire rights to the Film Special under the letter agreement or by any other means, then John Lennon and Yoko Ono acting on behalf of Joko shall have complete control over all aspects of the Film, including, but not limited to artistic, creative and format controls.
"(7) Should Joko repurchase the Special under the terms of the letter agreement, or acquire rights to the Film Special under the letter agreement, or by any other means then it shall have the exclusive right to:
"(a) license the rights to the Special for television broadcast;
"(b) re-edit the special into an extended length film for distribution as motion picture;
"(c) dispose of the special in any other way as it sees fit * * *
"(11) All copyrightable materials to the films of the concert shall be registered in the names Joko and Event, with the specific understanding between the parties that the films (intakes and outtakes) of the concert in which John Lennon and Yoko Ono, Plastic Ono and Elephant’s Memory perform shall be the exclusive property of Joko * * *
"(12a) It is specifically understood that Event shall be responsible for the procurement of all releases from all performers in the film and Madison Square Garden, with the specific understanding that if said releases are not procured and Joko acquires rights to the Film, Event shall be liable to Joko for any expenses it incurs including moneys it must pay to ABC under the terms of the letter agreement”.
Defendant claims that these agreements, taken together, establish that the Lennons retained all property rights to those portions of the films and sound tracks of the concerts. Defendant, however, provides no proof of the terms of the letter agreement, nor that Joko or the Lennons purchased the film and sound track rights in accordance with its terms, nor proof that a separate agreement was obtained from plaintiff or their reuse as required by the SAG 1967 Television Agreement.
Before turning to the question of the sufficiency of plaintiffs complaint, a primary issue to be resolved is whether this court is divested of subject matter jurisdiction because some or all of plaintiffs claims are preempted by the Federal Copyright Act (17 USC). Under the Judicial Code (28 USC § 1338 [a]), the *235 United States District Courts are granted jurisdiction "exclusive of the courts of the states in * * * copyright cases.” (28 USC § 1338 [a].) Defendant points to 17 USC § 301 in support of her claim that plaintiffs causes of action are preempted. The relevant part of that section states:
" § 301. Preemption with respect to other laws
"(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. ” (17 USC § 301 [a] [emphasis supplied].)
For section 301 to apply, and thus preempt an otherwise proper State claim, a two-tier ,test must be met. The first test examines the nature of the rights granted under State law; the second examines the nature of the work in which the protection under the copyright statute is claimed.
Works within the statute’s purview include, "original works of authorship fixed in any tangible medium of expression” (17 USC § 102 [a]); these include "compilations”[4] and "derivative work”.[5] (17 USC § 103.)
The particular works in this case are a videotape, a film and a long-playing record album (hereinafter the works) and clearly fall within the definition of "derivative works” of the film and sound track recorded on August 30, 1972. (See, 17 USC § 101, "derivative work”.) As such, they are covered by the Copyright Act as original works of authorship.[6] (See, 17 USC §§ 102, 103.) ‘_,
*236 The second prong of the test for application of the preemption statute calls for an examination of the causes of action in the complaint and whether the rights asserted in the challenged causes of action are "legal or equitable rights that are equivalent to any of the exclusive rights[7] within the general scope of copyright”. (17 USC § 301 [a] [emphasis added]; see also, Editorial Photocolor Archives v Granger Collection, 61 NY2d 517 [1984].) The four causes of action asserted by the plaintiff are invasion of privacy (Civil Rights Law §§ 50, 51), fraudulent representation, conversion and unfair competition. Each must be examined independently as to whether or not it is equivalent to any of the exclusive rights enumerated in 17 USC § 106.[8]
The New York Court of Appeals was called upon to apply this equivalency test for similar causes of action in Meyers v Waverly Fabrics (65 NY2d 75 [1985]). In that case a designer sued the respondent for breach of an express oral contract, misrepresentation through false labeling, unauthorized licensing, damage to her reputation and interference with contractual relationships. The Court of Appeals, in addressing the question of preemption, relied on a Congressional Report (HR Rep No. 94-1476, 94th Cong, 2d Sess, reprinted in 1976 US Code Cong & Admin News 5659, 5748) which reads:
"[C]ommon law rights of 'privacy’, 'publicity,’ and trade secrets * * * would remain unaffected as long as the causes of action contain elements, such as an invasion of personal rights or a breach of trust or confidentiality, that are different in kind from copyright infringement * * *
"Section 301 is not intended to preempt common law protec *237 tion in cases involving activities such as false labeling, fraudulent representation and passing off even where the subject matter involved comes within the scope of the copyright statute.”
The court in Meyers (supra), held that the unauthorized licensing, damage to reputation and interference with contractual relationships claims were preempted, while the breach of contract and false labeling claims were not. (Supra, at 78.)
In the case at bar, it is clear from the cited House Report that plaintiff’s first cause of action predicated on a violation of the New York Civil Rights Law and plaintiff’s third cause of action based on fraud would not be preempted as they involve something more than rights equivalent to those under the Federal Copyright Act. (See, e.g., Factors Etc. v Pro-Arts, Inc., 496 F Supp 1090 [SD NY 1980].)
State law claims that rely on the misappropriation branch are, however, preempted. (See, Warner Bros, v American Broadcasting Cos., 720 F2d 231 [2d Cir 1983].) The Second Circuit has held that "[t]o the extent * * * [an] unfair competition claim seeks protection against * * *< copying, it is a claim based on a right equivalent to 'exclusive rights within the * * * scope of copyright.’ ” (Durham Indus, v Tomy Corp., 630 F2d 905, 919 [2d Cir 1980].)
The second cause of action is for conversion, but not conversion of a physical object, conversion of plaintiff’s property rights in the work. Property rights in the work would be rights to reproduce, distribute, sell, rent or lease the works. Such rights are clearly "equivalent” to those set forth in section 106 of the Federal Copyright Act (17 USC) and therefore the second cause of action is preempted.
The fourth cause of action is that of unfair competition, alleging both misappropriation and "palming off”. That portion of the cause of action alleging misappropriation is clearly preempted. (See, Meyers v Waverly Fabrics, supra; Warner Bros, v American Broadcasting Cos., supra.) However, insofar as the fourth cause of action sets forth a claim for "palming off” or "passing off” it is outside the statute. (See, Meyers v Waverly Fabrics, supra; see also, Towle Mfg. Co. v Godinger Silver Art Co., 612 F Supp 986 [SD NY 1985].)
Having established subject matter jurisdiction for some of plaintiff’s claims, the court turns to examine the sufficiency of those causes of action that have not been preempted. With respect to plaintiff’s first cause of action, section 51 of the New *238 York Civil Rights Law permits an individual to recover damages if another uses plaintiffs "name, portrait or picture” for advertising or trade purposes without first obtaining his consent (Civil Rights Law § 51), and the cases have held that this statute creates a "right of privacy” and a "right of publicity”. (See, e.g., Stephano v News Group Publ., 64 NY2d 174 [1984].) Taking the allegations of plaintiffs first cause of action as true, as the court must (see, Rovello v Orofi.no Realty Co., 40 NY2d 633, supra), plaintiff has set forth a valid claim under the statute. Contrary to defendant’s contentions, it is not clear that plaintiff sold or disposed of his rights under the statute (Civil Rights Law § 51), or that the Showtime press release was purely within the "newsworthiness” exception (see, Freihofer v Hearst Corp., 65 NY2d 135 [1985]), so as to preclude this claim as a matter of law. (Cf., Velez v VV Publ. Corp., 135 AD2d 47 [1st Dept 1988].)
The plaintiffs third cause of action in fraud is also sufficiently pleaded. To plead a cause of action in fraud, plaintiff must allege that defendant knowingly uttered a falsehood with the intent of depriving plaintiff of some benefit, and that plaintiff was deceived and damaged thereby. (County of Westchester v Becket Assocs., 102 AD2d 34 [2d Dept 1984], affd 66 NY2d 642 [1985].) As far as defendant’s argument that plaintiff fails to state in detail the circumstances constituting the fraud, as required by CPLR 3016 (b), the complaint provides sufficient detail of the occurrences and transactions (occurring over 14 years ago) constituting the alleged fraud so as to give adequate notice thereof. (See, Foley v D’Agostino, 21 AD2d 60 [1st Dept 1964].)
The fourth cause of action based on a claim of "palming off” is more troublesome. As the defendant points out, a claim for "palming off” requires plaintiff to establish that defendant presented plaintiffs performance in a manner likely to cause consumer confusion as to the identity of the performers. (Shaw v Time-Life Records, 38 NY2d 201 [1975].) In the Shaw case, a famous big-band leader, Artie Shaw, brought an action against Time-Life Records for damages in connection with recordings of Shaw’s arrangements by an unknown orchestra which were marketed under the title of "Swing with Artie Shaw”. Addressing the claim of "palming off”, the court stated: "While Time-Life was entitled to copy Shaw’s arrangements and to compete with Shaw’s own records, Time-Life was under an obligation to 'use reasonable care to inform the public of the source of its product’ and to identify its own *239 merchandise Test it be mistaken for that of the plaintiff.’ * * * While the use of Shaw’s name is permissible, dishonesty in the use of the name is condemned * * * Time-Life could not 'palm-ofF its records as being the personal work of Shaw, or, for that matter, the work of any of the other artists whose arrangements were copied by Time-Life. Nor could Time-Life generate consumer confusion regarding its product and that of its competition.” (Supra, at 206.)
The court upheld Shaw’s cause of action and affirmed the denial of defendant’s summary judgment motion holding that there was a triable issue of fact as to "whether reasonably discriminating members of the public would be confused or misled by defendant’s advertising.” (Shaw v Time-Life Records, supra, at 207.)
In the case at bar, it is conceded by plaintiff that the album, the video and the Showtime press release credit him with having performed on the keyboards. Indeed, the very mention of his name and use of his portrait in these items is the predicate for his "right of publicity” claim in the first cause of action. There is no allegation of deception in the advertising or the credits and it is difficult, if not impossible, to see how the public would in any way be "confused or misled.” The plaintiff concedes that the video and album accurately depict the concerts and therefore, the "palming off” claim, though not preempted, is insufficiently pleaded on its face and is dismissed.
Finally, we turn to Extraordinary Event’s motion to intervene pursuant to CPLR 1013. This provision of the CPLR leaves to the discretion of the court whether to permit a party to intervene in any action where a statute confers a right to intervene or when the person’s claim or defense and the main action have common questions of law or fact. (CPLR 1013.) The proposed complaint by Extraordinary Event alleges that it is a third-party beneficiary of the representation made to plaintiff and others that One-to-One was to receive all the proceeds from the exploitation of the recordings made of the 1972 "One-to-One” concerts and seeks an accounting and payment of any proceeds thereof. The claim asserted by the plaintiff, however, is not based on such a representation, but rather on an alleged misrepresentation which induced plaintiff to perform at union wages and be filmed for what he thought would be a special shown only on the one telecast in December 1972. The alleged fraud is that defendant intended at the time of this representation to commercially exploit the *240 film and sound track at a later date. Any claim by Extraordinary Event to the film and sound track or the proceeds thereof would arise out of, and be governed by, the agreement between Extraordinary Event and Joko Films, or on a separate, actionable fraud perpetrated upon Extraordinary Event, but not as a derivative claim from any wrongdoing to plaintiff. It does not appear from the foregoing that granting leave to intervene to Extraordinary Event would further judicial economy or serve any constructive purpose, and would just cause confusion. The motion to intervene, therefore, is denied.

. Were the motion treated as one for summary judgment, the facts presented are sufficient to preclude summary judgment. (See, Missett v Missett, 125 AD2d 275 [1st Dept 1986].)

. The Screen Actors Guild (SAG) 1967 Television Agreement, although necessary in determining the extent of defendant’s "unlimited right”, is not provided by movant. It is, however, provided by plaintiff as exhibit "G” to the affirmation in opposition.

. This agreement refers to another agreement between Extraordinary Event and ABC Television Network (referred to as the letter agreement). This letter agreement is not attached to any of the moving papers.

. 17 USC § 101 defines a "compilation” as: "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.”

. 17 USC § 101 defines a "derivative work” as: "[A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent, an original work of authorship, is a 'derivative work’.”

. The exception set forth in 17 USC § 301 (c), wherein sound recording fixed before February 15, 1972 are not subject to preemption under section 301, does not apply as the sound recordings here were fixed in the sound track on August 30, 1972, six months after the exclusion date.

. 17 USC § 106. "Exclusive rights in copyrighted works "Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
"(1) to reproduce the copyrighted work in copies or phonorecords;
"(2) to prepare derivative works based upon the copyrighted work;
"(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
"(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
"(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.”

. Id.