Alan ROSENFELD, as Trustee of the John Marquis Converse Testamentary Trusts for the Benefit of Veronica Converse and Sheila Converse, Plaintiff,

v.

W.B. SAUNDERS, A DIVISION OF HARCOURT BRACE JOVANOVICH, INC., and Joseph G. McCarthy, Defendants.

No. 88 Civ. 8207 (JMC).

United States District Court,
S.D. New York.

Jan. 9, 1990.

Ben C. Friedman, Baker & Friedman, New York City, for plaintiff.

Ira S. Sacks, Fried Frank Harris Shriver & Jacobson, New York City, for defendant Saunders.

Eugene F. Farabaugh, Milbank Tweed Hadley & McCloy, New York City, for defendant McCarthy.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

The plaintiff's motion for a preliminary injunction is denied. Fed.R.Civ.P. 65(a).

## BACKGROUND

Plaintiff, Alan Rosenfeld, brings this action in his capacity as the trustee of the John Marquis Converse Testamentary Trusts for the Benefit of Veronica Converse and Sheila Converse [the "Trusts"]. The Trusts are the testamentary heirs of the intangible personal property rights of the late John Marquis Converse, M.D. ["Dr. Converse"]. Defendant W.B. Saunders ["Saunders"], a division of Harcourt Brace Jovanovich, Inc., is a Delaware corporation engaged in business as a book publisher. Defendant Joseph G. McCarthy, M.D. ["Dr. McCarthy"] is the Lawrence D. Bell Professor of Plastic Surgery and Director of the Institute of Reconstructive Plastic Surgery at New York University Medical Center, positions to which Dr. McCarthy succeeded after Dr. Converse's death.

Pursuant to a 1961 contract between Dr. Converse and Saunders, Dr. Converse was the principal author and editor of *Reconstructive Plastic Surgery*, a five volume treatise published by Saunders in 1964. Dr. Converse selected his student and then employee Dr. McCarthy to serve as assistant editor of the second edition of *Reconstructive Plastic Surgery*, a seven volume treatise published by Saunders in 1977. *Reconstructive Plastic Surgery* is a comprehensive reference known as the "Bible" of plastic surgery.

Due to the rapid evolution of plastic surgery, Albert E. Meier, then supervising editor of Saunders for the second edition of *Reconstructive Plastic Surgery*, wrote to Dr. Converse on November 12, 1980 outlining the many changes necessary to update the work for a third edition. Declaration of Albert E. Meier in Opposition to Plaintiff's Motion for a Preliminary Injunction, at ¶ 8, 89 Civ. 8207 (JMC) (S.D.N.Y. Dec. 18, 1989) ["Meier Decl."]. In his reply, Dr. Converse acknowledged the need to publish a third edition. *Id.* at Exh. 4. Dr. Converse also indicated to Meier that Dr. McCarthy should serve as associate editor of the third edition and as the sole editorial successor for any future editions of *Reconstructive Plastic Surgery* after Dr. Con-

verse's death. *Id.* In the event of such future editions after Dr. Converse's death, Dr. Converse suggested that Dr. McCarthy shall be the sole recipient of any royalties. *Id.* Dr. Converse's plans for a third edition were abandoned upon his death on January 31, 1981. It is unclear precisely how much work Dr. Converse had undertaken to update the second edition prior to his death. At a minimum, Dr. Converse began revising certain chapters and received commitments from prospective contributors to the third edition. *See id.*

Following Dr. Converse's death, Saunders submitted a proposed contract to Dr. McCarthy in July 1981 to serve as editor for the third edition of a work to be entitled *Converse's Reconstructive Plastic Surgery.* For reasons not made clear by the record, no contract was executed. Soon thereafter, Meier determined that the state of the art of plastic surgery had evolved so dramatically since 1977 that a totally new work was needed, not simply a revised edition of *Reconstructive Plastic Surgery.* Consequently, Meier sent Dr. McCarthy a formal invitation letter to edit a new multivolume textbook on plastic surgery written by various contributors. Meier Decl., Exh. 12. On August 14, 1984, Ardmore Medical Books, an imprint of Saunders, and Dr. McCarthy executed a contract pursuant to which Dr. McCarthy agreed to edit and deliver a new work entitled *Plastic Surgery. Id.* at Exh. 15.

In an effort to procure the necessary authors for *Plastic Surgery,* Dr. McCarthy sent solicitation letters to potential contributors. Plaintiff contends that the solicitation letters falsely represented that the contributions would appear in the third edition of the Converse work. Defendants contend that the solicitation letters accurately stated that the contributions would appear in a new textbook of plastic surgery edited by Dr. McCarthy reflecting the recent extraordinary progress in the field.

Saunders went to press with the McCarthy work in September 1989 and spent $1,055,000 to print 7,000 copies of the eight volume set. Advertising expenses in the amount of $120,000 were also incurred by Saunders. Approximately 2,300 of the 7,000 sets printed have been shipped to doctors, hospitals, and medical libraries. Approximately 1,250 orders are currently awaiting shipping.

Plaintiff now moves for a preliminary injunction enjoining defendants from publishing, selling, or distributing the McCarthy work. Plaintiff contends that the McCarthy work constitutes reverse palming off under section 43(a) of the Lanham Trademark Act of 1946, 15 U.S.C. § 1125(a) (1988) ["Lanham Act"], and copyright infringement under section 501 of the Copyright Act of 1976, 17 U.S.C. § 501 (1988). Plaintiff also asserts common law claims of breach of contract, misappropriation of the publicity value in the Converse name, unfair competition, and tortious interference with prospective economic advantage.

## DISCUSSION

In order to obtain a preliminary injunction, plaintiff must demonstrate " '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' " *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

### I. *Lanham Act*

Plaintiff seeks a preliminary injunction on the ground that defendants' distribution of the McCarthy book in commerce with false designations of origin and false descriptions of fact is likely to cause consumer confusion as to the true origin, sponsorship, and authorship of the book in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988). Defendants contend that plaintiff lacks standing to assert a Lanham Act violation on behalf of the Trusts due to the absence of commercial injury. Defendants further contend that plaintiff has failed to establish the neces-

sary likelihood of consumer confusion to warrant the issuance of injunctive relief.

Section 43(a) of the Lanham Act broadly proscribes the use of false descriptions and false designations of origin in the advertising and sale of goods or services in commerce.[1] *See* 15 U.S.C. § 1125(a) (1988). The Second Circuit has repeatedly construed section 43(a) as the federal equivalent to the common law cause of action for unfair competition. *See, e.g., PPX Enters., Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 124 (2d Cir.1984) [*"PPX Enters. I"*]; *Gilliam v. American Broadcasting Cos.,* 538 F.2d 14, 24 (2d Cir.1976). As such, the Second Circuit has successfully employed section 43(a) to combat a wide variety of deceptive commercial practices, including various forms of misappropriation and unfair competition. *See PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 270–71 (2d Cir.1987) [*"PPX Enters. II"*] (citing a broad spectrum of section 43(a) violations).

■ The Lanham Act generally prohibits two types of unfair competition— palming off (or passing off) goods under the name of another and false advertising concerning the goods or services of the advertiser. *See Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403, 1406 (9th Cir.1988). Traditional palming off involves the selling of one's goods or services under the name of a more popular competitor. *See* 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 2.01, at 2–3 (4th ed. 1981). However, the palming off facet of section 43(a) liability also encompasses merchandising practices or conduct " 'economically equivalent' to palming off." *Smith v. Montoro,* 648 F.2d 602, 605

(9th Cir.1981). Such practices include a false designation of origin in the form of reverse palming off, which is actionable under section 43(a) of the Lanham Act. *See id.; Williams v. Curtiss–Wright Corp.,* 691 F.2d 168, 172 (3d Cir.1982); *Sims v. Blanchris, Inc.,* 648 F.Supp. 480, 482 (S.D.N.Y.1986). Express reverse palming off occurs when "the wrongdoer removes the name or trademark on another party's product and sells that product under a name chosen by the wrongdoer." *Smith,* 648 F.2d at 605. Implied reverse palming off, in contrast, occurs when "the wrongdoer simply removes or otherwise obliterates the name of the manufacturer or source and sells the product in an unbranded state." *Id.* While reverse palming off involves the misappropriation of another's talents as in traditional palming off cases, the gravamen of the harm in a reverse palming of case is that "the originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." *Id.* at 607. The harm, however, also runs to the ultimate purchaser who is "deprived of knowing the true source of the product and may even be deceived into believing that it comes from a different source." *Id.*

### A. *Standing under the Lanham Act*

■ Section 43(a) of the Lanham Act permits a suit to be brought "by any person who believes that he or she is or is likely to be damaged" by the use of any false description or representation concerning the origin or qualities of goods or services in commerce. 15 U.S.C. § 1125(a) (1988). Contrary to a literal reading of the

---

1. Section 43(a) of the Lanham Act governs false designations and false descriptions as follows:

 Any person who, on or in connection with any goods or service, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination therefor, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

 (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorhsip, or approval of his or her goods, services, or commercial activities by another person, or

 (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

 15 U.S.C. § 1125(a) (1988).

statute, however, section 43(a) does not confer standing on an individual who merely "believes" that he is likely to be damaged. *See* 1A Callmann, *supra,* § 5.04, at 35. Rather, section 43(a) demonstrates a congressional intent to give "a broad class of suitors *injured or likely to be injured* by such wrong the right to relief in the federal courts." *L'Aiglon Apparel Co. v. Lana Lobell, Inc.,* 214 F.2d 649, 651 (3d Cir.1954) (emphasis added). While section 43(a) is a remedial provision that should be broadly construed to protect persons engaged in commerce from a wide variety of misrepresentations resulting in unfair competition, *see CBS Inc. v. Springboard Int'l Records,* 429 F.Supp. 563, 566 (S.D.N.Y. 1976), the Second Circuit has restricted standing to purely commercial parties, thereby excluding ordinary consumers, *see PPX Enters. I,* 746 F.2d at 124–25; *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). While a plaintiff under section 43(a) need not be a direct or indirect competitor of the alleged wrongdoer, he must at a minimum establish "the potential for a competitive or commercial injury." *Berni v. International Gourmet Restaurants of America, Inc.,* 838 F.2d 642, 648 (2d Cir. 1988). The touchstone analysis governing standing under section 43(a) is whether the commercial party has a " 'reasonable interest to be protected against the alleged false advertising.' " *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir.1980) (quoting 1 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 18.2(b), at 625 (3d ed. 1967)); *accord PPX Enters. I,* 746 F.2d at 125 (citing other circuits relying on Callmann).

■ In the instant case, plaintiff has commercial interests that may reasonably be affected by a false designation of origin on the McCarthy work. Plaintiff does not contend that the Trusts are in the business of writing medical treatises. However, the 1961 contract between Saunders and Dr. Converse expressly provides that Saunders shall pay Dr. Converse or his heirs a royalty of ten percent for domestic sales of all copies of *Reconstructive Plastic Surgery* and five percent for foreign sales. *See* Meier Decl., Exh. 11, at ¶ 8. Thus, as heirs of Dr. Converse, the Trusts earn money every time a copy of *Reconstructive Plastic Surgery* is sold. Conversely, the Trusts lose potential profit every time a sale is lost to a competitor, such as the McCarthy book. As a result of their royalty interests, the Trusts have a pecuniary stake in the continued sales of *Reconstructive Plastic Surgery* that makes them a business competitor of defendants. The Second Circuit has expressly recognized that potential lost royalty payments constitute a direct pecuniary interest sufficient to invoke standing under section 43(a). *See PPX Enters. I,* 746 F.2d at 125.

**B.** *Injunctive Relief under the Lanham Act*

■ To state a claim for injunctive relief in an unfair competition action under section 43(a), a plaintiff need only establish a " 'likelihood that an appreciable number of *ordinary prudent purchasers* are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " [2] *Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.,* 832 F.2d 1317, 1321 (2d Cir.1987) (emphasis added) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)); *accord* 1A Callmann, *supra,* § 5.04, at 33. It is well settled that such a showing of likelihood of confusion sufficiently establishes both the requisite irreparable harm and likelihood of success on the merits typically required for the issuance of injunctive relief. *See, e.g., Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1314 (2d Cir.1987); *Standard & Poor's Corp. v.*

---

**2.** In contrast, in order to establish entitlement to damages for unfair competition under section 43(a), the plaintiff has the burden of proving *actual* consumer confusion resulting from the false designation of origin. *PPX Enters. II,* 818 F.2d at 271.

Commodity Exchange, Inc., 683 F.2d 704, 708 (2d Cir.1982).

■ Any false attribution of principal authorship constitutes a section 43(a) violation if it misrepresents the contributions of the person designated as author. *Follet v. New American Library, Inc.*, 497 F.Supp. 304, 311 (S.D.N.Y.1980). Thus, failure to attribute authorship to a co-author resulting in only a partially accurate designation of origin constitutes reverse palming off within the ambit of section 43(a). *See Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1407 (9th Cir.1988). Copyright ownership or lack of such ownership is not dispositive on the issue of unfair competition under the Lanham Act. *Follet*, 497 F.Supp. at 311. At this stage of the proceeding, however, the Court need not decide whether in fact defendants did engage in reverse palming off by using a designation of origin that is only partially correct. It is sufficient for the purpose of the instant application for injunctive relief that plaintiff has failed to establish a likelihood of consumer confusion on the part of the ordinary prudent purchaser.

■ The role of disclaimers in trademark infringement cases under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (1988), provides an appropriate analogy that mitigates against a finding of a likelihood of confusion in the instant action. The Second Circuit has repeatedly recognized that an effective disclaimer can significantly reduce the potential for consumer confusion caused by an infringing product if it clearly designates the source of the product. *See, e.g., Home Box Office*, 832 F.2d at 1315; *Charles of the Ritz Group*, 832 F.2d at 1324; *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1330 (2d Cir. 1987). To successfully employ the use of a disclaimer, the infringing party has an affirmative duty to "come forward with evidence sufficient to demonstrate that any proposed materials would significantly reduce the likelihood of consumer confusion." *Home Box Office*, 832 F.2d at 1316. Where the likelihood of confusion is substantial, the disclaimer must be prominent and disclose the competitive relationship between the two companies in a nonambiguous manner. *Charles of the Ritz Group*, 832 F.2d at 1324. Alternatively, where the likelihood of confusion is minimal to moderate, the court has broader discretion to uphold the adequacy of the disclaimer. *See Soltex Polymer Corp.*, 832 F.2d at 1330. Thus, courts must examine the effectiveness of disclaimers on a case by case basis "by considering the circumstances of the relevant business and its consumers." *Home Box Office*, 832 F.2d at 1315.

■ While the preface to the McCarthy work does not contain a typical disclaimer, it nonetheless mitigates against any finding of consumer confusion in a similar manner. The first paragraph of the preface reads as follows:

> Where does a book begin? Initially, I think of a warm September afternoon in a hotel in Madrid when I first organized an outline of the chapters while waiting for an international surgery meeting to begin. However, a scientific book is only an extension of earlier publications. This text is descended from *Reconstructive Plastic Surgery*, edited in 1964 by my predecessor John Marquis Converse, and reedited in 1977. I had been an Assistant Editor of the latter. Many of the ideas and principles, if not the exact words, that were integral to the teaching and writing of Dr. Converse live on in the present volumes. *Reconstructive Plastic Surgery* in turn was derived from his earlier collaboration with V.H. Kazanjian, *The Surgical Treament [sic] of Facial Injuries*, published in 1949, 1959, and 1974.

1 Plastic Surgery xvii (J. McCarthy ed. 1990). The preface further acknowledges the contributions of Dr. Converse:

> With the deliberate exception of parts of Chapters 1 and 35, originally written by Dr. Converse and revised through subsequent editions of various books, few paragraphs in these volumes remain unchanged from the 1977 edition. Many of the authors, however, have used material from the previous editions.

*Id.*[3] Moreover, immediately following the title page to the McCarthy work is a full-page dedication to Dr. Converse bearing a photograph of Dr. Converse and paying tribute to his unrivaled enthusiasm for plastic surgery along with his legendary contributions to the field. At a minimum, such attribution to Dr. Converse in the preface and dedication mitigates against any potential consumer confusion as to the true source of the work.

Courts have found the sophistication of the buyers to be a factor that further mitigates against a finding of a likelihood of confusion in a trademark infringement action. *See, e.g., Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988); *Charles of the Ritz Group,* 832 F.2d at 1323. The McCarthy work was not a mass market book sold in retail bookstores throughout the country. On the contrary, the book is sold by Saunders directly to doctors, hospitals, and medical libraries. These sophisticated purchasers understand that a medical treatise by definition typically builds upon previous works in the field since continuing change is the hallmark of medical practice. Thus, each generation of scholars stands on the shoulders of its predecessors. The fact that the market for the McCarthy work consists of relatively sophisticated buyers, coupled with the attribution to Dr. Converse in the preface and dedication, prevent any potential consumer confusion. It is highly unlikely that these sophisticated purchasers will entertain the misconception that Dr. McCarthy simply removed the name of Dr. Converse from *Reconstructive Plastic Surgery* and passed the book on as his own.

Therefore, plaintiff's application for a preliminary injunction under section 43(a) of the Lanham Act is denied.

## II. *Breach of Contract*

Plaintiff claims that Saunders materially and impliedly breached its 1961 contract with Dr. Converse by publishing a third edition of *Reconstructive Plastic Surgery* without the consent of Dr. Converse's heirs and by failing to give notice to Dr. Converse's heirs upon cancellation of the contract. Plaintiff further contends that Dr. McCarthy intentionally procured the material breach of the contract by inducing Saunders to publish the third edition of *Reconstructive Plastic Surgery* for the benefit of Dr. McCarthy and without plaintiff's consent.

■ While the Court has the discretion to permit injunctive relief for breach of contract, "the classic remedy for breach of contract is an action at law for damages. If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable harm may be found as a matter of law." *Gulf & Western Corp. v. Craftique Productions, Inc.,* 523 F.Supp. 603, 607 (S.D.N.Y.1981). Where the damages are "clearly difficult to assess and measure," irreparable harm renders a legal remedy inadequate. *Danielson v. Local 275, Laborers International Union of North America,* 479 F.2d 1033, 1037 (2d Cir.1973). However, the mere necessity of making an informed approximation of damages should not preclude the adequacy of a legal remedy. *See USA Network v. Jones Intercable, Inc.,* 704 F.Supp. 488, 493 (S.D. N.Y.1989).

### A. *Subsequent Editions*

■ Paragraph 9 of the 1961 contract between Saunders and Dr. Converse provides that prior to the publication of any "subsequent edition" of *Reconstructive Plastic Surgery* after the death of Dr. Converse, Saunders shall consult with Dr. Converse's heirs regarding "the necessity of revising [the work] and supplying new matter for the purpose of keeping it up-to-date. . . ." Meier Decl., Exh. 11, at ¶ 9. If it is "mutually agreed" that the revision is desirable, Saunders may decide who is to be procured for that purpose and any expense incident to the revision shall be de-

---

**3.** Chapter One, which provides a historical overview of plastic surgery, provides further attribution to Dr. Converse in a footnote on the first page of the chapter.

ducted from the royalties that accrue to the estate from the subsequent edition.[4] *Id.*

The Court finds that there are readily apparent differences and similarities between the Converse work and the McCarthy work.[5] However, whether in fact Dr. McCarthy's work is a third edition of *Reconstructive Plastic Surgery* thus triggering the consent requirement of Paragraph 9 is a question of fact reserved for trial. At this time, the Court need not resolve the merits of plaintiff's breach of contract claims. For purposes of the instant application for injunctive relief based upon breach of contract, it is sufficient that plaintiff has failed to establish irreparable injury. Assuming that Dr. McCarthy's work is in fact a third edition of *Reconstructive Plastic Surgery*, plaintiff's breach of contract claim essentially becomes a claim for royalties due to the estate from sales of the subsequent edition and for proper attribution to Dr. Converse. At trial, plaintiff will have an opportunity to prove the amount of royalties that ac-

crued to the estate on the revised edition. Additionally, the Court has a panoply of remedies at its disposal to cure the lack of attribution to Dr. Converse if in fact the Court determines that Dr. Converse deserves editorial or authorship credit. These remedies include, but are not limited to, ordering Saunders to recall the McCarthy work to provide proper attribution to Dr. Converse by rebinding each volume, inserting a new title page, and/or inserting appropriate corrective stickers.[6]

### B. *Cessation of Publication*

Pursuant to Paragraph 11 of the 1961 contract between Saunders and Dr. Converse, Saunders may cancel the contract at any time after two years from the date of first publication of the work (1964) by giving Dr. Converse sixty days advance written notice of its intention to cancel the contract. Meier Decl., Exh. 11, at ¶ 11. Within sixty days after cancellation becomes effective, Dr. Converse may request

---

4. Paragraph 9 governs subsequent editions as follows:

> Prior to publication of a second or any subsequent edition of the Work, the PUBLISHER shall consult with the AUTHOR regarding the necessity of revising it and supplying new matter for the purpose of keeping it up-to-date, and if it shall be mutually agreed revision and/or supplying of new matter is desirable, the AUTHOR at his own expense shall forthwith make the revision and/or supply such new matter either personally or by competent persons employed by him, but should the AUTHOR fail to so do within twelve months from a date mutually agreed upon, the PUBLISHER may then procure some other person to revise the Work and/or to supply the new matter. Following the death of the AUTHOR, or in the event of his disability, the PUBLISHER shall consult with his heirs, or with his legal representatives or assigns, as the case may be, regarding the necessity of revising the Work and supplying new matter, and, if it shall be mutually agreed that either course is desirable, the PUBLISHER may decide who is to be procured for that purpose. If some other person is procured, either because of the AUTHOR's failure or because of his death or disability, the expense incident thereto shall be deducted from any royalties that may accrue to the AUTHOR on the revised edition after publication.

> Meier Decl., Exh. 11, ¶ 9.

5. Although a detailed comparison of the competing works is beyond the scope of this opin-

ion, the Court notes that the McCarthy work contains over 5,500 pages, making it approximately 40% longer than the Converse work. Of the 165 contributors to the McCarthy work, 40 had contributed to the Converse work. Plaintiff maintains that the McCarthy work appropriates without attribution at least 33% of the Converse work. Supplemental Affidavit of Ben C. Friedman, at ¶ 3, 89 Civ. 8207 (JMC) (S.D.N.Y. Dec. 18, 1989). In contrast, Dr. McCarthy contends that 80% of his book is completely different from Dr. Converse's earlier work. Affidavit of Dr. Joseph G. McCarthy in Opposition to Motion for Preliminary Injunction, at ¶ 12, 89 Civ. 8207 (JMC) (S.D.N.Y. Dec. 18, 1989). In particular, Dr. McCarthy notes that his book deals extensively with subjects barely examined in the Converse work, including tissue expansion, laser surgery, liposuction, body contouring, Down Syndrome, secondary rhinoplasty, electrical injuries, dysmorphology, rigid skeletal fixation, and angiosomes. *Id.*

6. The viability of these remedies is made possible by the fact that the McCarthy work is sold directly to doctors, hospitals, and medical libraries, and as such is not a mass market book. Declaration of Lewis Reines in Opposition to Plaintiff's Motion for a Preliminary Injunction at ¶ 22, 89 Civ. 8207 (JMC) (S.D.N.Y. Dec. 18, 1989) ["Reines Decl."]. Therefore, Saunders has a record of all who purchased the book directly from it. *Id.*

that Saunders assign all copyrights it holds in *Reconstructive Plastic Surgery* to Dr. Converse.[7] *Id.* Plaintiff contends that Saunders breached its contractual obligation to notify them of the July 1981 contract between Saunders and Dr. McCarthy which effectively cancelled the prior contract between Saunders and Dr. Converse, thereby depriving Dr. Converse's heirs of their right to demand assignment of the copyrights.

Plaintiff's claim that Saunders materially breached Paragraph 11 of the contract by failing to give plaintiff the required cancellation notice does not present a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation. Plaintiff correctly points out that Rider One to the purported agreement between Saunders and Dr. McCarthy dated July 16, 1981 provides that "[t]his Agreement supersedes and cancels a previous Agreement for the Work between John Marquis Converse and the Publisher executed on April 18, 1961." Meier Decl., Exh. 8, at Rider No. 1. However, the purported agreement between Saunders and Dr. McCarthy was never fully executed, as only Dr. McCarthy signed the document. Dr. McCarthy's signature standing alone cannot bind Saunders and thus constitute an effective cancellation of the 1961 contract between Saunders and Dr. Converse. As is made clear in the cover letter dated July 21, 1989 from Saunders to Dr. McCarthy accompanying the agreement, the agreement is nothing more than a *proposed contract.* *See* Meier Decl., Exh. 7.

Paragraph 11 of the contract governs "cessation of publication" by Saunders. However, plaintiff has failed to provide any evidence that Saunders did in fact cease publication of *Reconstructive Plastic Surgery* and payment of royalties to the estate. On the contrary, the record shows that Saunders has continued to sell both complete sets and individual volumes of the Converse work.[8] Such sales by Saunders, coupled with plaintiff's inability to prove an effective cancellation of the contract between Saunders and Dr. Converse, establish that in all likelihood Saunders did not cease publication of *Reconstructive Plastic Surgery* thus triggering plaintiff's rights under Paragraph 11.

Therefore, plaintiff's application for a preliminary injunction based upon breach of contract is denied.[9]

### III. *Copyright Infringement*

 In copyright infringement cases, the standard for the issuance of injunctive relief is less rigorous than the traditional inquiry into irreparable harm and likelihood of success on the merits. A copyright plaintiff need not set forth a detailed showing of irreparable harm to obtain a preliminary injunction. Rather,

---

7. Paragraph 11 governs the cessation of publication as follows:

 If at any time after two years from the date of first publication of said Work, conditions shall in the PUBLISHER's judgment make its further publication inadvisable, the PUBLISHER may cancel this agreement by giving to the AUTHOR sixty (60) days advance notice in writing of its intention so to do, said notice to be forwarded by registered letter addressed to the AUTHOR at his last known post office address and to become effective as of its date of mailing. In such event, the AUTHOR, at any time within sixty (60) days after the cancellation becomes effective, shall have the right to take over from the PUBLISHER the plates or type of said Work at half cost, and all copies of the Work then on hand at one fourth of the retail price of the Work, upon payment in cash therefor, and should the AUTHOR fail to do so, the PUBLISHER shall then have the right to destroy said plates

and/or to sell all copies on hand at such prices as it can obtain therefor and, following the sale of the last of such copies, shall, upon request, assign all copyrights it may hold in said Work to the AUTHOR.
Meier Decl., Exh. 11, at ¶ 11.

8. 10,063 complete sets of the second edition of *Reconstructive Plastic Surgery* have been sold since it was published in 1977. In 1988, 59 complete sets were sold. No complete sets of the second edition were sold in 1989, but sales of individual volumes were between 4 and 28 copies. *See* Reines Decl., at ¶ 24. Plaintiff has not submitted contrary statistics.

9. Since plaintiff is unable to prove irreparable harm and likelihood of success on the merits for their breach of contract claim against Saunders, it follows that plaintiff cannot substantiate this claim against Dr. McCarthy for inducing the breach of contract by Saunders.

the general rule in the Second Circuit is that a prima facie case of copyright infringement raises a presumption of irreparable harm. *See Video Trip Corp. v. Lightning Video, Inc.,* 866 F.2d 50, 51–52 (2d Cir.1989); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985); *Wainwright Sec., Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *accord West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219, 1229 (8th Cir. 1986); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). To establish a prima facie case of copyright infringement, the plaintiff must prove ownership of a valid copyright and subsequent unauthorized copying by the defendant. *Weissmann v. Freeman,* 868 F.2d 1313, 1320 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright: A Treatise on the Law of Literary, Musical and Artistic Property, and the Protection of Ideas* § 13.01, at 13–4 to –10 (1989).

■ Under section 410(c) of the Copyright Act, a certificate of copyright registration raises a presumption of copyright validity and ownership. *See* 17 U.S.C. § 410(c) (1988). Plaintiff recognizes that he is unable to satisfy this first element of copyright infringement because Saunders has legal title to the copyrights in *Reconstructive Plastic Surgery* pursuant to Paragraph 7 of the 1961 contract between Saunders and Dr. Converse.[10] However, plaintiff contends that Saunders continues to hold the copyrights because Saunders

failed to notify the Trusts of its July 1981 cancellation, and thereby deprived the Trusts of their right to demand assignment of the copyrights under Paragraph 11. Thus, plaintiff seeks a declaratory judgment that Saunders materially breached Paragraph 11 of the contract by failing to notify plaintiff of the cancellation of the ·contract; that the contract be cancelled *nunc pro tunc* as of July 21, 1981, the date of the material breach; that all copyrights held by Saunders in *Reconstructive Plastic Surgery* be assigned to plaintiff *nunc pro tunc* as of sixty days after cancellation of the contract; that the McCarthy work be declared to infringe the Trusts' copyrights; ·and that defendants be permanently enjoined from infringing the Trusts' exclusive rights as copyright owners under 17 U.S.C. ·§ 106 (1988).

As previously shown, however, there is a ·serious dispute involving the very provision of the contract between Saunders and Dr. Converse which plaintiff claims supports the transfer of the copyrights back to the estate. Plaintiff has failed to prove that Saunders cancelled its contract with Dr. Converse and thereby triggered the Trusts' ability to demand assignment of the copyrights. In sum, plaintiff has failed to establish ownership of a valid copyright, an essential prerequisite for a prima facie case ·of copyright infringement.[11]

Therefore, plaintiff's application for a preliminary injunction based upon copyright infringement is denied.

·IV. *State Law Claims*

A. *Right of Publicity*

■ Plaintiff asserts a cause of action based upon the common law right of public-

---

**10.** Paragraph 7 governs the transfer of copyright as follows:

The AUTHOR agrees that title to said Work, to the manuscript therefor, and to the sketches, drawings, photographs and/or other material referred to in Paragraphs 1, 2 and 3 shall belong to the PUBLISHER absolutely ... and further agrees the PUBLISHER shall have, and hereby grants to it, the sole and exclusive right to copyright said Work and/or said sketches, drawings, photographs and/or other material in the name of the PUBLISHER, as proprietor, absolutely, in any and all countries and to publish it and/or them therein.

Meier Decl., Exh. 11, at ¶ 7.

**11.** Since plaintiffs failed to establish ownership of a valid copyright, the Court need not pass on whether Saunders and Dr. McCarthy engaged in unauthorized copying. Therefore, the Court will not consider the recent Second Circuit decision in *Weissmann v. Freeman,* 868 F.2d 1313, 1320 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989), governing the significance of joint authorship of a prior existing work when one of the co-author's subsequently prepares a derivative work based upon the prior joint work.

ity as developed in New York. Plaintiff alleges that defendants' misappropriated the commercial value in and to the Converse name by using the name to induce preeminent practitioners, doctors, and scholars to contribute to the McCarthy work under the false representation that the revision was for the purpose of publishing a third edition of *Reconstructive Plastic Surgery*. Defendants argue that the solicitation letters written to potential contributors accurately represented that McCarthy would be editing a new book and not simply a subsequent edition of *Reconstructive Plastic Surgery*. Defendants further argue that plaintiff's misappropriation claim is legally deficient since there is no common law right to publicity in New York.

There is no doubt that "much confusion shrouds the so-called 'right of publicity,' largely because it has often been discussed under the rubric 'right of privacy.'" *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 220 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). However, a brief examination of the evolution of the right of publicity from the common law right of privacy illustrates that the type of harm protected by the right of publicity is proprietary in nature and therefore does not warrant injunctive relief.

In one of the seminal works on the right of privacy, Dean Prosser delineated four distinct torts comprising the law of privacy: (1) appropriation of an individual's name or likeness for another person's benefit; (2) intrusion upon an individual's seclusion or solitude; (3) public disclosure of embarrassing private facts; and (4) publicity which places an individual in a false light in the public eye. Prosser, *Privacy*, 48 Calif.L. Rev. 383, 389 (1960). Courts generally equate the right of publicity with the exclusive right of an individual to control the commercial value of his name or likeness and prevent any unauthorized appropriation of this value by others for commercial gain. *See, e.g., Rogers v. Grimaldi*, 875 F.2d 994, 1003–04 (2d Cir.1989); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 133 (2d Cir.1984), *cert. denied*, 471 U.S. 1054, 105

S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Allen v. Men's World Outlet, Inc.*, 679 F.Supp. 360, 365 (S.D.N.Y.1988). Thus, the common law right of publicity is a descendent of the commercial appropriation branch of the common law invasion of privacy.

In an invasion of privacy action, the plaintiff typically seeks to redress injury to feelings by minimizing the violative intrusion. *See Factors*, 579 F.2d at 220. In contrast, Prosser notes that in a publicity action "[t]he interest protected is not so much a mental one as a *proprietary* one, in the exclusive use of the plaintiff's name and likeness as an aspect of his identity." Prosser, *supra*, at 406 (emphasis added). This distinction in the type of harm protected finds support in the Supreme Court's observation that the state interest protected by the right of publicity is "closely analogous to the goals of patent and copyright law, focussing on the right of the individual to reap the rewards of his endeavors and having little to do with protecting feelings or reputation." *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 573, 97 S.Ct. 2849, 2856, 53 L.Ed.2d 965 (1977). Thus, the distinguishing feature of a publicity action is that the plaintiff does not necessarily object to the unauthorized commercial appropriation if in fact he receives the commercial benefit of the exploitation. *See id.* at 573–74, 97 S.Ct. at 2856–57; *Lerman*, 745 F.2d at 134; *Factors*, 579 F.2d at 220. As one commentator has noted, in the typical publicity action "the plaintiff is not objecting primarily to the *fact* of the exploitation, but rather to the *loss of financial gain* associated with the unauthorized appropriation." Kwall, *Is Independence Day Dawning for the Right of Publicity*, 17 U.C. Davis L.Rev. 191, 197 (1983) (emphasis in original).

The impetus for protecting the right of publicity is the goal of "'preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay.'" *Zacchini*, 433 U.S. at 577, 97 S.Ct. at 2858 (quoting

Kalven, *Privacy in Tort Law—Were Warren & Brandeis Wrong?*, 31 Law & Contemp. Probs. 326, 331 (1966)). In light of this rationale, there appears to be merit in plaintiff's characterization of the solicitation letters. For example, various solicitation letters from Dr. McCarthy and his assistant editors seek potential contributions to "the next edition of Converse," "the new Converse edition," and "the new edition of Converse." *See* Reply Affidavit of Ben C. Friedman, Exhs. 3, 6 & 7, 89 Civ. 8207 (JMC) (S.D.N.Y. Dec. 20, 1989). In contrast, other letters from Dr. McCarthy seek potential contributions to "a new textbook of plastic surgery to take the place of the seven volume set edited by Dr. Converse." Meier Decl., Exh. 16. In reviewing a motion for injunctive relief, however, the Court need not resolve the merits of the foregoing dispute. If in fact plaintiff can prove at trial that the defendants' solicitation letters written to potential contributors misappropriated the commercial value in the Converse name, plaintiff may be adequately compensated with money damages. Therefore, plaintiff has failed to establish the requisite element of irreparable harm to warrant the issuance of a preliminary injunction.

In addition to the absence of irreparable harm, plaintiff has clearly failed to establish a likelihood of success on the merits. In *Stephano v. New Group Publications, Inc.*, 64 N.Y.2d 174, 474 N.E.2d 580, 485 N.Y.S.2d 220 (1984), the New York Court of Appeals expressly held that there is no independent common law right of publicity under New York law, as that right is subsumed within the statutory right of privacy.[12]

By its terms, the statute applies to *any* use of a person's picture or portrait for advertising purposes whenever the de-fendant has not obtained the person's written consent to do so.... Since the 'right of publicity' is encompassed under the Civil Rights Law as an aspect of the right of privacy, which, as noted, is exclusively statutory in this State, the plaintiff cannot claim an independent common-law right of publicity.

*Id.* at 183, 474 N.E.2d at 584, 485 N.Y.S.2d at 224 (emphasis added); *accord Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 87 (2d Cir.1989); *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1198 (9th Cir.) (applying New York law), *cert. denied*, —— U.S. ——, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989); *Allen v. Men's World Outlet, Inc.*, 679 F.Supp. 360, 365 (S.D.N.Y. 1988); *Allen v. National Video, Inc.*, 610 F.Supp. 612, 621 (S.D.N.Y.1985). Plaintiff, however, refers to the common law of New York as the source for the right of publicity. Based upon the unambiguous holding of *Stephano* and its subsequent application by the courts in this circuit, plaintiff has failed to establish the necessary likelihood of success on the merits for their common law right of publicity cause of action.

Therefore, plaintiff's application for a preliminary injunction based upon the common law right of publicity is denied.

### B. *Unfair Competition*

■ Plaintiff alleges that defendants' competing use of the valuable property rights in and to the Converse name constitutes unfair competition under the common law of New York. As with an unfair competition claim under section 43(a) of the Lanham Act, the essence of unfair competition under New York common law is "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to

---

12. In New York, the right of privacy is exclusively a statutory right governed by sections 50 and 51 of the Civil Rights Law. *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 140, 480 N.E.2d 349, 353, 490 N.Y.S.2d 735, 739 (1985); *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 440, 434 N.E.2d 1319, 1321–22, 449 N.Y.S.2d 941, 943–44 (1982). Section 50 of the Civil Rights Law provides that "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person ... is guilty of a misdemeanor." N.Y.Civ. Rights Law § 50 (McKinney 1976). Section 51 creates a civil cause of action for invasion of privacy under section 50 by permitting injunctive relief and damages. *See* N.Y.Civ. Rights Law § 51 (West Supp.1989).

the origin of the goods." *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,* 678 F.Supp. 424, 429 (S.D.N.Y.1987); *accord Shaw v. Time–Life Records,* 38 N.Y.2d 201, 206, 341 N.E.2d 817, 820, 379 N.Y.S.2d 390, 395 (1975); *Ippolito v. Ono–Lennon,* 139 Misc.2d 230, 238, 526 N.Y. S.2d 877, 883 (Sup.Ct.1988), *modified,* 150 A.D.2d 300, 542 N.Y.S.2d 3 (1st Dep't 1989).

Due to plaintiff's inability to establish a likelihood of consumer confusion under section 43(a) of the Lanham Act, *see supra,* plaintiff's application for a preliminary injunction under New York common law of unfair competition is also denied.

### C. *Tortious Interference with Prospective Economic Advantage*

A claim for tortious interference with a prospective economic advantage typically involves interference with a " 'business relationship not amounting to a contract,' resulting in a breach or severance of the relationship itself, or at least some injury to that relationship." *PPX Enters. II,* 818 F.2d at 270. Recovery under New York law is limited to those situations where a plaintiff can show "the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are 'dishonest, unfair or in any other way improper.' " *Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D.N.Y. 1983) (emphasis in original) (quoting *Robbins v. Ogden Corp.,* 490 F.Supp. 801, 811 (S.D.N.Y.1980)). However, if the alleged tortious interference simultaneously advances the defendant's own competing interests, plaintiff must also establish that the defendant employed criminal or fraudulent conduct. *PPX Enters. II,* 818 F.2d at 269. Turning to the instant case, plaintiff alleges that the defendants interfered with the Trusts' prospective economic advantage to exploit the name and reputation of Dr. Converse by improperly using the Converse name to induce practitioners, doctors, and scholars to devote their efforts to defendants' own economic advantage, and thereby harming the Trusts.

The Court need not resolve the merits of plaintiff's claim for tortious interference with prospective economic advantage. Any wrongful interference with a business relationship of the Trusts resulting from defendants' use of the Converse name to induce contributions to the McCarthy work is adequately compensable by damages calculated at trial.

Therefore, plaintiff's application for injunctive relief based upon tortious interference with prospective economic advantage is denied.

### CONCLUSION

Accordingly, plaintiff's motion for a preliminary injunction is denied. Fed.R.Civ.P. 65(a).